**John Russell THOMPSON,
Petitioner-Appellant,**

v.

**James A. LYNAUGH, Interim Director,
Texas Department of Corrections,
Respondent-Appellee.**

No. 87–5523.

United States Court of Appeals,
Fifth Circuit.

July 3, 1987.

Mark Stevens, San Antonio, Tex., for petitioner-appellant.

Robert S. Walt, Asst. Atty. Gen., Austin, Tex., for respondent-appellee.

Before RUBIN, JOHNSON, and JONES, Circuit Judges.

ALVIN B. RUBIN, Circuit Judge:

The petitioner in this habeas corpus case has been condemned by Texas courts to be executed for the crime of capital murder. He contends that he was deprived of his federal constitutional rights in ten respects, urging most strenuously the alleged insufficiency of the evidence to show that he intended to kill a person whom he shot during the course of an armed robbery—an insufficiency alleged to deny him due process in two ways, both by the insufficiency of the evidence to sustain a verdict of guilty, and its insufficiency to satisfy the requirements of the Texas sentencing statute. Finding that the evidence is sufficient to satisfy constitutional requirements in both respects and that the petitioner's federal constitutional rights were not violated in any of the other respects complained of, we affirm the district court judgment denying him relief.

I.

As set forth by the *en banc* opinion of the Texas Court of Criminal Appeals, affirming the conviction and death sentence of John Russell Thompson,[1] and as supported by the record, the basic facts are these. Thompson, Fernando Guerrero, and Guerrero's friend Christie Sparks Moore met at another friend's house in San Antonio, Texas, where Thompson initiated a discussion about committing an armed robbery. Guerrero agreed, and Thompson and Guerrero attempted to secure a gun. Their efforts were unsuccessful, and Guerrero then enlisted Moore's aid in secretly obtaining, from the home of Moore's stepfather, a .45–caliber automatic pistol that belonged to her stepfather. Thompson, who had some familiarity with firearms, manipulated the weapon, which had three safety mechanisms, to be certain he knew how to operate it. Guerrero also manipulated the weapon. Either Guerrero or Thompson, though the evidence does not show which, disengaged the safety devices. The gun was then placed under Guerrero's seat in the car. The three then picked up a friend of Thompson, Esther Cervantes, who supplied a bandana and a pair of sunglasses to be used as a disguise.

Thompson drove the group around looking for a place to rob. After inspecting several other places, which appeared not to be opportune targets, Thompson drove by the office of a place of business called Pioneer Stor & Lok. Thompson said to the

1. *Thompson v. State,* 691 S.W.2d 627 (Tex.Cr. App.1984) (en banc).

group in his car that he saw a woman inside counting money. Because several cars were parked at the business, Thompson drove onto Loop 410, where he encountered a pedestrian. Thompson slowed down and Guerrero conversed with the pedestrian. As a result, a police officer stopped Thompson and gave him a ticket for obstructing traffic. Thompson, slightly upset, then returned to Pioneer Stor and Lok with his three companions. Leaving them in the car, he donned the disguise, took the murder weapon, got out of the car, and went into the office. Moore, who was hiding with Cervantes in the back seat, testified at the trial that she heard "a large bang" and Thompson then emerged from the office. He got in the car and they drove away.

Thompson said to the group that he hadn't taken any money because there was none. He also said that the woman in the office (who was Mary Kneupper) had not taken him seriously and had laughed at him when he first entered the office and pointed the pistol at her. When she later fled the office area through a doorway, he jumped over the office counter and attempted to pull her back into the office area to stop her flight. He said that the pistol had discharged accidentally, and that he did not think he had wounded her. Moore also testified that, when Thompson later learned from the media that Mrs. Kneupper had died, he cried and said repeatedly that he had shot her accidentally.

An autopsy performed on the victim revealed a wound made by a bullet that entered the left side of her neck, severed her spine, and exited the right side of her head in front of her ear. The doctor who performed the autopsy testified that it was his opinion that the wound was caused by a large caliber bullet fired from a distance of less than two feet, perhaps as little as a few inches. A firearms examiner testified that in his opinion Mrs. Kneupper was shot from a distance of three to six inches.

Ronald Ash, a friend of Thompson and Fernando Guerrero, testified that the day after the death of Mrs. Kneupper he spoke with Thompson and Guerrero regarding the robbery-murder that had occurred the previous day. Thompson told him that "they had tried to make a score and killed an old lady," but he did not say that this was accidental.

After the jury had returned a guilty verdict, the sentencing phase of the trial began. Evidence was adduced that Thompson had been convicted of felony theft in November 1972, for which he successfully terminated a sentence of three years on probation. He had been convicted of felony burglary of a habitation and felony theft in 1974 and was sentenced to five-to-six years, and two-to-six years imprisonment, respectively. When arrested for burglary, he had been in possession of a .22-caliber pistol and several boxes of ammunition. Four days before the Pioneer episode, the police recovered a loaded and fully operational .32 automatic pistol from a car that Thompson was driving. The state also introduced other evidence, which it is unnecessary to recount, of Thompson's criminal propensities. There was no evidence that Thompson had ever previously been convicted of robbery or had ever personally fired a weapon in the course of an offense.

Moore testified, inter alia, that, while she had known Thompson for only four months, she had gotten to know him very well and had never seen him do a violent act. She did not believe that Thompson deliberately killed Mrs. Kneupper or that he was a cold-hearted person who could walk into the office, kill Mrs. Kneupper, and walk out. Moore, Thompson, and Guerrero had all agreed before the attempted robbery that the pistol would be used only to scare the victim, and Thompson had assured Moore that he intended to use the pistol only in this manner.

Before beginning the trial, Thompson filed a motion to bar the death penalty, in which he averred that the manner in which the prosecution had elected to seek the death penalty was arbitrary and capricious, and consequently in violation of the Fifth, Eighth and Fourteenth Amendments to the Constitution. A hearing was held pursuant to this motion on the same day it was filed.

The evidence established that, after some unsuccessful plea negotiations, the State had previously tried Thompson for the murder of Mrs. Kneupper, Thompson had been convicted of capital murder and sentenced to be executed, but the conviction was reversed by the Texas Court of Criminal Appeals on September 23, 1981. Immediately thereafter, Gordon Armstrong, the felony chief of the District Attorney's office, offered Thompson's counsel, Nick Rothe, a plea bargain: a life sentence if Thompson would plead guilty. Although Thompson did not accept the offer at this time, Armstrong did not withdraw it.

Thompson was reindicted on January 13, 1982. The case was assigned for trial in February. Ed Springer, an assistant district attorney who was the lead prosecutor in the office but had previously tried only one capital case, was assigned to try Thompson. Springer wanted to know if a plea bargain was possible, so he urged Rothe to talk with Thompson about such a deal, stating that it would be acceptable to him but would require approval by his superiors. Springer testified that he wanted to know whether a bargain could be struck as soon as possible so he would have enough time to prepare for trial.

After Springer was assigned to the case, Rothe suggested to Springer that Thompson would plead guilty in exchange for a sentence of thirty years. The state did not accept this offer. Rothe subsequently suggested to both Springer and Armstrong that Thompson would accept fifty years, but this offer was not accepted either.

Although Rothe testified at the later hearing in state court on Thompson's application for habeas corpus that Springer had on several occasions "made an offer of a life sentence," the evidence warrants the conclusion reached by the Texas court, that Springer himself did not make any offer. He did, however, solicit an offer from Rothe, and indicated that he would not oppose a life sentence in exchange for a guilty plea.

During the two weeks before trial, Springer spent time trying to locate the transcript and exhibits from Thompson's first trial, locating witnesses, and trying to decide who should be called to testify.

On the Thursday preceding the start of the second trial, which was scheduled to and did begin the following Monday, Rothe told Springer that Thompson would plead guilty in exchange for a promise of a life sentence. Springer conveyed the offer to his superiors, who rejected it and stated that the prosecution's offer of a life sentence had been withdrawn. The case went to trial as scheduled, and Thompson was convicted in the guilt phase of the trial. After the jury responded "Yes" to the sentencing interrogatories, the court sentenced Thompson to be executed. The conviction was affirmed on direct appeal. Thompson then filed an application for a writ of habeas corpus in state court, and a hearing was held. At this hearing Thompson proved that he had signed a confession that had been suppressed at both trials because it had been induced by promises of leniency by the state. Thompson also showed that, after Fernando Guerrero had been arrested, he initially refused to give a statement. When, however, a detective showed him Thompson's confession, which implicated him, Guerrero agreed to and did give a statement. Guerrero, however, did not testify in either of Thompson's trials and his statement was not adduced.

Rothe, Thompson's lawyer, testified that, before the first trial, San Antonio Police Officer Maurice Rose had falsely promised Thompson that, if he confessed, his mother would not have to go through the agony of a capital murder trial and his possibly being executed. Later, an employee of the District Attorney's office had asked Rothe if Thompson would discuss the matter of an art theft from a local institute because certain theft detectives were interested in recovering some masterpieces and believed Thompson might know something about the theft. Rothe agreed to this discussion, and it became clear to Rothe that, if Thompson could clear up the matter, there would be some "slack" offered to him. However, Thompson could provide no information.

Moore testified that, after she was arrested, she refused to discuss the case with the police and refused to give a statement. While under arrest she spoke with her father, who told her she was just as responsible as anyone and should cooperate in any way possible. Her father made her feel very guilty, but she was still afraid to give a statement. One or two days later, the police showed her the statements made by Thompson and Guerrero and told her that it would be to her benefit to make a statement. She then gave a written statement in order to relate her side of the story and exonerate Esther Cervantes. Before Thompson's second trial, Moore was tried and convicted for aggravated robbery, and served her sentence. As already indicated, she did testify at Thompson's second trial.

## II.

We now turn to the issues raised by Thompson.

A. WHETHER THE EVIDENCE ADDUCED AT THOMPSON'S TRIAL WAS SUFFICIENT TO SUPPORT HIS CONVICTION, THAT IS, SUFFICIENT TO ENABLE A RATIONAL JUROR TO CONCLUDE BEYOND A REASONABLE DOUBT THAT THOMPSON DELIBERATELY CAUSED THE VICTIM'S DEATH WITH THE REASONABLE EXPECTATION THAT DEATH WOULD RESULT.

■ In the guilt-innocence phase of a trial for capital murder in Texas, the jury is required first to consider whether the accused intentionally committed murder. If the jury renders a verdict of guilty, the first special issue submitted during the sentencing phase asks the jury whether the defendant's conduct "was committed deliberately and with the reasonable expectation that the death of the deceased or another would result."[2] Proof beyond a reasonable doubt is necessary before the jury can

return an affirmative answer.[3] The due process clause of the federal Constitution forbids a conviction unless the evidence reviewed in the light most favorable to the prosecution demonstrates that a rational jury could have found the accused guilty—i.e., that Thompson acted deliberately and with the reasonable expectation that Mrs. Kneupper's death would result[4]—beyond a reasonable doubt.

We summarize the evidence on this issue, most of which has already been mentioned. Thompson initiated the conversation about committing a robbery. He and Guerrero telephoned several acquaintances to try to get a gun to use in the robbery, to no avail. Moore then obtained her stepfather's pistol and gave it to Thompson and Guerrero. Although Thompson asserted that the weapon would be used only to scare the victim, he and Guerrero loaded it and became familiar with how it worked. Thompson said that, if he got caught by the police, he would not give himself up, and would prefer to die rather than be apprehended. The murder weapon had several safety devices and did not have a hair trigger. During the robbery attempt, Mrs. Kneupper thought the incident was a joke and laughed at Thompson. When she attempted to leave the office area, Thompson pursued her and tried to prevent her escape. There was no evidence of a struggle. The weapon was fired at close range. Although Thompson told others that the weapon was accidentally fired, he spoke of the episode to Ronald Ash on the day after the murder, telling Ash that he had killed an old lady without stating that the killing was accidental or unintentional. Thompson had been arrested twice before with weapons in his possession, and four days before the Pioneer episode the police had recovered a loaded weapon from a car he was driving.

A jury could reasonably conclude from this evidence that Thompson was familiar with firearms similar to the murder weapon and knew of their capabilities. From all

2. Tex.Code Crim.Proc.Ann. art. 37.071(b)(1) (Vernon Supp.1987).

3. *Id.* art. 37.071(c).

4. *Jackson v. Virginia,* 443 U.S. 307, 314–25, 99 S.Ct. 2781, 2786–92, 61 L.Ed.2d 560 (1979).

of this, a rational jury could find beyond a reasonable doubt that Thompson acted deliberately and with the expectation that Mrs. Kneupper's death would result.

### B. DOES THE CAPITAL SENTENCING STATUTE NARROW THE CLASS OF PERSONS ELIGIBLE FOR THE DEATH SENTENCE AS REQUIRED BY THE CONSTITUTION?

■ Thompson next attacks the constitutionality of the Texas capital-punishment statute on the ground that it fails properly to narrow the class of persons eligible for the death sentence. In Texas, once a defendant has been found guilty of capital murder, the jury must answer special issues to determine punishment. First, the jury must decide whether the defendant acted deliberately and with the reasonable expectation that the death of the deceased or another would result. Second, the jury must determine whether there is a probability that the defendant would commit criminal acts of violence in the future that would constitute a continuing threat to society.[5] The third special issue, not presented in this case, would require the jury to determine whether, "if raised by the evidence," "the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased."[6] If the jury answers all questions "Yes," the court must impose a death sentence. If the jury answers any question "No," or fails to answer any question, the court must sentence the defendant to life imprisonment.[7]

Thompson contends that the constitutional defect is in the insufficiency of the evidence to support the jury finding on the first special issue at the sentencing part of the trial. Thompson notes that, at the guilt-innocence stage, the jury must find that the defendant committed murder intentionally.[8] Equating "intentionally" with "deliberately," as used in the first special issue at the sentencing stage, Thompson asserts that article 37.071(b)(1) is meaningless. He attempts to elevate this to the level of a constitutional flaw by claiming that the statute violates *Furman v. Georgia*[9] by failing to narrow the sentencer's discretion to prevent the arbitrary imposition of the death penalty.

The Supreme Court has held that the Texas statute defining capital murder[10] sufficiently narrows the class of persons subject to the death penalty by requiring the finding of at least one aggravating circumstance.[11] Further, the second special issue has been construed to allow a defendant to introduce, during the punishment phase of his trial, whatever mitigating evidence he can muster, thus ensuring that a death sentence is not "wantonly or freakishly" applied.[12] Thompson has not argued that the future dangerousness determination is *by itself* insufficient to narrow the class of persons subject to the death penalty. Thompson fails to demonstrate how the first special issue at punishment precludes the admission of evidence in mitigation, and thus results in the wanton or freakish imposition of a death sentence.

Thus, the Texas death penalty scheme requires the jury to find at least one aggravating circumstance—a future threat to society—that does not duplicate any finding made at the guilt phase. Hence, we need not reach the argument that the special issue about "deliberateness" duplicates a guilt-phase issue.

---

5. Tex.Code Crim.Proc.Ann. art. 37.071(b)(1), (2) (Vernon Supp.1987).

6. *Id.* art. 37.071(b)(3).

7. *Id.* art. 37.071(e).

8. Tex.Penal Code Ann. § 19.03(a)(2) (Vernon Supp.1987).

9. 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972).

10. Tex.Penal Code Ann. § 19.03(a)(2) (Vernon Supp.1987).

11. *Barefoot v. Estelle,* 463 U.S. 880, 896–97, 103 S.Ct. 3383, 3396, 77 L.Ed.2d 1090 (1983); *Jurek v. Texas,* 428 U.S. 262, 268–74, 96 S.Ct. 2950, 2954–57, 49 L.Ed.2d 929 (1976).

12. *Jurek v. Texas,* 428 U.S. at 276, 96 S.Ct. at 2958.

The duplication argument has arisen directly in two recent cases. The Eighth Circuit has held, in *Collins v. Lockhart*,[13] that an aggravating circumstance that duplicates an element of the crime does not fulfill the constitutional narrowing function. In a Louisiana case presenting only one aggravating factor that unambiguously duplicated an element of the crime this court held, in *Lowenfield v. Phelps*,[14] that a state may accomplish the narrowing function by defining the crime only in the guilt phase. Several other cases from this court have rejected the Eighth Circuit's *Collins* reasoning.[15] The Supreme Court has granted certiorari in *Lowenfield* to review the duplication issue and a jury coercion issue. Thompson's case is readily distinguishable from both *Collins* and *Lowenfield* by the existence of an alternative narrowing issue at the penalty phase.[15a]

We therefore do not discuss Thompson's argument that the words "deliberately," as used in the sentencing-phase inquiry, and "intentionally", as used in the guilt-phase inquiry, are linguistic equivalents.[16]

## C. DID THE TRIAL COURT'S FAILURE TO DEFINE THE TERMS "DELIBERATELY" AND "REASONABLE DOUBT" *SUA SPONTE* RENDER THOMPSON'S TRIAL UNFAIR?

In his third and seventh grounds for relief, Thompson alleges that the trial court erred when it failed to define "deliberately" and "reasonable doubt" in its instructions to the jury. He concedes that no such definitions were requested at trial but contends that the court should have acted *sua sponte*.

While Thompson alleges in conclusory fashion that the Sixth and Eighth Amendments are implicated, his claim must ultimately be considered a due process claim of denial of a fundamentally fair trial. A federal habeas corpus court will review alleged errors in the trial court's instructions only to determine whether the claimed errors rendered the entire trial fundamentally unfair.[17]

The court did not err in failing to define the term "deliberately." As both the Texas Court of Criminal Appeals[18] and this court[19] have held, the word in its common meaning is sufficiently clear to allow the jury to decide the special issues on punishment.

Thompson's assertion that the jurors would have been unable to define "deliberately" so as to distinguish that term from the mental state "intentionally" is belied by the record. Each of Thompson's jurors who was requested at voir dire to draw a distinction between the terms was able to do so, and the prosecutors and defense counsel eloquently argued that the question of deliberateness is distinct from the previously answered question of Thompson's intent. Thus, the fact that the term "deliberately" was not defined in the court's charge did not render Thompson's trial unfair.

Similarly, the failure to include a definition of "reasonable doubt" does not deprive

**13.** 754 F.2d 258 (8th Cir.), *cert. denied,* —— U.S. ——, 106 S.Ct. 546, 88 L.Ed.2d 475 (1985).

**14.** 817 F.2d 285, 288–89 (5th Cir.), *cert. granted,* —— U.S. ——, 107 S.Ct. 3227, 97 L.Ed.2d 734 (1987).

**15.** *See, e.g., Wingo v. Blackburn,* 783 F.2d 1046, 1051 (5th Cir.), *stay granted,* —— U.S. ——, 107 S.Ct. 9, 92 L.Ed.2d 765 (1986), *cert. denied,* (1987); *reh'g denied,* —— U.S. ——, 107 S.Ct. 3244, 97 L.Ed.2d 749 (1987).

**15a.** *Cf. Zant v. Stephens,* 462 U.S. 862, 885–90, 103 S.Ct. 2733, 2747–49, 77 L.Ed.2d 235 (1983); *Williams v. Maggio,* 679 F.2d 381, 389–90 (5th Cir. Unit A 1982) (en banc) [Judge Rubin continues to adhere to the dissent from *Williams* but agrees that it constitutes the law of the circuit.]. *But cf. Cartwright v. Maynard,* 822 F.2d 1477 (10th Cir.1987) (en banc).

**16.** *But see Heckert v. State,* 612 S.W.2d 549, 552 (Tex.Crim.App.1981).

**17.** *Henderson v. Kibbe,* 431 U.S. 145, 154–55, 97 S.Ct. 1730, 1736–37, 52 L.Ed.2d 203 (1977).

**18.** *King v. State,* 553 S.W.2d 105, 107 (Tex.Crim. App.1977), *cert. denied,* 434 U.S. 1088, 98 S.Ct. 1284, 55 L.Ed.2d 793 (1978).

**19.** *Milton v. Procunier,* 744 F.2d 1091, 1096 (5th Cir.1984), *cert. denied,* 471 U.S. 1030, 105 S.Ct. 2050, 85 L.Ed.2d 323 (1985).

a defendant of due process. Although the jury must be instructed that the state bears the burden of proving the defendant's guilt beyond a reasonable doubt, attempts by trial courts to define "reasonable doubt" have been disfavored by this court.[20] Such attempts often result in using the term itself in the definition and serve only to confuse the concept in the minds of jurors.[21] Thompson was not denied due process by the exclusion of a definition of "reasonable doubt" from the court's jury instruction.

### D. WAS THE EVIDENCE ADDUCED AT THOMPSON'S TRIAL SUFFICIENT TO ENABLE ANY RATIONAL JUROR TO CONCLUDE BEYOND A REASONABLE DOUBT THAT THOMPSON INTENTIONALLY KILLED THE VICTIM?

Texas defines capital murder as murder committed in the course of committing or attempting to commit certain other defined offenses.[22] Murder is defined as intentionally or knowingly causing the death of an individual.[23] In determining whether the evidence is sufficient, a reviewing court must examine the evidence in the light most favorable to the state. The evidence is sufficient if it can be said that *"any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."*[24]

Based on our discussion of Issue I, we conclude that the evidence was sufficient to enable any rational juror to conclude beyond a reasonable doubt that Thompson had in mind the conscious objective of killing Mrs. Kneupper when he fired the fatal shot.

### E. WERE THOMPSON'S CONSTITUTIONAL RIGHTS VIOLATED WHEN THE PROSECUTOR INFORMED JURORS DURING VOIR DIRE THAT A PRESUMPTION OF INTENT TO KILL ARISES FROM USE OF A DEADLY WEAPON?

During the prosecutor's voir dire, he incorrectly advised the jurors that they could presume intent to kill from the fact that the defendant used a pistol. Thompson objected to this, and contends that this statement amounted to an "instruction" that "substantially diminished" the state's burden of proof on the intent element and thereby violated due process as recognized in *Sandstrom v. Montana.*[25]

The trial court explicitly instructed the jury that it must find beyond a reasonable doubt that Thompson shot the deceased during the course of committing or attempting to commit robbery with the intention of killing her in order to find him guilty of capital murder. Intent was properly defined in the charge in accordance with state law. Moreover, the court instructed the jury that, if it believed the shooting was the result of an accidental discharge of the gun while Thompson was reaching or grabbing for the deceased, it must acquit him. It instructed the jury that they were bound by the law given in the court's charge and that the burden of proof is on the state. The only presumption mentioned in the court's charge is the presumption that a defendant is presumed to be innocent until his guilt is established beyond a reasonable doubt. Nowhere in the charge is there any reference to a presumption arising from the use of a deadly weapon. There was no *Sandstrom* error in the charge.

---

**20.** *See United States v. Rodriguez,* 585 F.2d 1234, 1240–42 (5th Cir.1978), *cert. denied,* 449 U.S. 835, 101 S.Ct. 108, 66 L.Ed.2d 41 (1980); *cf. Holland v. United States,* 348 U.S. 121, 140, 75 S.Ct. 127, 138, 99 L.Ed. 150 (1954).

**21.** *See Holland v. United States,* 348 U.S. at 140, 75 S.Ct. at 138; *Milton v. Procunier,* 794 F.2d at 1096.

**22.** Tex.Penal Code Ann. § 19.03(a)(2) (Vernon Supp.1987).

**23.** *Id.* § 19.02(a)(1) (Vernon 1974).

**24.** *Jackson v. Virginia,* 443 U.S. at 319, 99 S.Ct. at 2789.

**25.** 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979).

**F. DID THE ADMISSION, DURING THE PUNISHMENT STAGE OF TRIAL, OF UNCORROBORATED ACCOMPLICE TESTIMONY THAT THOMPSON HAD COMMITTED EXTRANEOUS OFFENSES DEPRIVE HIM OF A FUNDAMENTALLY FAIR TRIAL?**

■ The state-law requirement that accomplice witness testimony be corroborated has no independent constitutional footing.[26] Moreover, on direct appeal, the Texas Court of Criminal Appeals affirmed that the corroboration requirements of article 38.14 of the Texas Code of Criminal Procedure are inapplicable to the testimony of accomplice witnesses as to extraneous offenses at the punishment phase of a capital murder trial.[27] Thompson concedes, as he must, that the Texas court has resolved this issue against him, but nevertheless argues that the issue should be examined by this court because the admission of uncorroborated accomplice testimony violated his rights to equal protection and due process.

■ Capital defendants are not a "suspect class" for equal protection purposes.[28] Thus, under rational-basis scrutiny, the Texas rule treating capital defendants differently by allowing uncorroborated accomplice testimony during the punishment phase of a capital trial need only rationally promote a legitimate governmental objective. The equal protection clause is offended only if the classification rests on grounds wholly irrelevant to the achievement of the state's objective.

The stated purpose of Tex.Code Crim. Proc.Ann. art. 37.071 (Vernon Supp.1987) is to place all relevant evidence regarding the defendant, both in aggravation and mitigation, before the jury to facilitate its ability to answer the special issues.[29] The rule on non-corroboration clearly promotes a legitimate state objective: to have *all* relevant facts regarding a defendant's character before the jury prior to its determination whether or not to impose a death sentence.[30] The evidence received from Christie Sparks Moore regarding Thompson's commission of numerous prejudicial extraneous offenses was clearly relevant, and Thompson does not claim to the contrary. Nor did the admission of this evidence render Thompson's trial fundamentally unfair, as the evidence, which was admitted only at the punishment phase, was subject to standards of relevance and sufficiency of proof.[31] The district court properly rejected Thompson's claim regarding the admission of this evidence.

**G. DID THE TRIAL COURT VIOLATE THOMPSON'S CONSTITUTIONAL RIGHTS BY FAILING TO INSTRUCT THE JURY *SUA SPONTE* THAT IT COULD NOT CONSIDER THE LAW OF PARTIES IN THE PUNISHMENT PHASE?**

■ As his eighth claim for relief, Thompson contends that it was error for the trial court to have failed *sua sponte* to instruct the jury that it could not consider the law of parties in the punishment phase of the trial in determining whether Thompson acted deliberately. Review of this claim is barred in these proceedings because Thompson did not timely object to the court's failure to give the instruction, nor did he request the instruction himself.

When a defendant fails to follow a state procedural rule and review of his claim of error is refused by state courts, federal habeas review of his constitutional claim is barred unless he can demonstrate cause for, and prejudice resulting from, his failure.[32] Texas requires that objections to

---

**26.** *See Caminetti v. United States,* 242 U.S. 470, 495, 37 S.Ct. 192, 198, 61 L.Ed. 442 (1917).

**27.** *Thompson v. State,* 691 S.W.2d at 633.

**28.** *Williams v. Lynaugh,* 814 F.2d 205, 208 (5th Cir.1987).

**29.** *See Jurek v. Texas,* 428 U.S. at 276, 96 S.Ct. at 2958.

**30.** *See Milton v. Procunier,* 744 F.2d at 1097 & n. 5.

**31.** *See id.* at 1097.

**32.** *Engle v. Isaac,* 456 U.S. 107, 129, 102 S.Ct. 1558, 1572, 71 L.Ed.2d 783 (1982).

the court's jury instructions be made before the court reads the charge to the jury.[33] Thompson did not object at trial to the omission of an instruction that the jury could not consider the law of parties in deciding whether he acted deliberately. When Thompson raised this claim for the first time in his state habeas application, the trial court noted his procedural default and declined to address the merits of his contention.[34] The Court of Criminal Appeals denied relief without written order based on the findings of the trial court.[35]

Thompson now asserts that there was good cause for his failure to object because state law in effect at the time of his trial allowed the law of parties to be applied at the punishment phase of a capital trial. He further asserts that he can now demonstrate prejudice, inasmuch as, because he was never acting alone in the attempted commission of several robberies prior to the murder, the jury "probably" considered the law of parties in assessing a death sentence.

■ These explanations do not excuse the procedural default. Futility of objection, even in the face of established legal precedent, will not constitute good cause to excuse a procedural default.[36] Moreover, Thompson demonstrates no prejudice inasmuch as the two special issues submitted to the jury clearly focus on his conduct and character, the law of parties was never raised at the guilt-innocence phase of trial, and neither side argued to the jury that the law of parties was applicable either at guilt-innocence or in answering the special issues on punishment. Thus, because the state applied its procedural bar to considering Thompson's claim, federal habeas corpus review is unavailable.[37]

## H. WAS THOMPSON DENIED DUE PROCESS BY THE STATE'S UTILIZATION OF EVIDENCE DERIVED FROM A POLICE OFFICER'S FALSE PROMISE OF LENIENCY TO HIM? WAS THIS CLAIM BARRED BY PROCEDURAL DEFAULT BECAUSE THOMPSON FAILED TO LODGE A CONTEMPORANEOUS OBJECTION TO THE ADMISSION OF SUCH EVIDENCE?

Thompson next asserts that he was deprived of due process of law and was subjected to cruel and unusual punishment by the state's improper use of evidence derived from his confession, which was induced by a police officer's false promise of leniency. He concedes that the state did not introduce his confession, which was suppressed at his first trial, in either of his trials.

The crux of Thompson's argument is that the state utilized Thompson's confession to obtain confessions from Fernando Guerrero and Christie Sparks Moore. While Guerrero did not testify and his confession was not introduced, Thompson argues that the nature of Guerrero's involvement became known to the state through Thompson's confession. Thompson further argues that Moore's confession was obtained through use of his and Guerrero's confessions. He implies that her testimony at trial was also derived from his confession.

Involuntary confessions obtained in violation of the Fifth Amendment may not of course be introduced at trial.[38] Likewise, evidence derived from constitutional violations may not be utilized at trial, for the "fruit of the poisonous tree"[39] is itself tainted.

---

**33.** Tex.Code Crim.Proc.Ann. art. 36.14 (Vernon Supp.1987).

**34.** *Ex parte Thompson,* Writ No. 86–W–0002, slip op. at 7–8 (226th Dist.Ct., Bexar County, Texas, Apr. 28, 1986).

**35.** *Ex parte Thompson,* Application No. 15,932–01 (Tex.Crim.App. Nov. 5, 1986).

**36.** *See Engle v. Isaac,* 456 U.S. at 130, 102 S.Ct. at 1573.

**37.** *See Bates v. Blackburn,* 805 F.2d 569, 573–74 (5th Cir.1986).

**38.** *Sims v. Georgia,* 385 U.S. 538, 87 S.Ct. 639, 17 L.Ed.2d 593 (1967); *Williams v. Maggio,* 727 F.2d 1387, 1389 (5th Cir.1984).

**39.** *Wong Sun v. United States,* 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963).

The state points out that Thompson failed to lodge a contemporaneous objection to Moore's testimony at trial, and that he has failed to allege any facts to support his claim of cause and prejudice for failing to object. The state court declined to address the merits of this claim when Thompson first raised it on collateral review because of the procedural default.

Even had this issue been properly raised, we would find no error in the court's failure *sua sponte* to exclude Moore's testimony. In determining the admissibility of testimony allegedly derived from an involuntary confession, the Supreme Court held in *Harrison v. United States*,[40] "The ... question is whether the petitioner's trial testimony was in fact *impelled* by the prosecution's wrongful use of his illegally obtained confessions."[41]

Based on this criterion, Thompson must prove that his involuntary confession "impelled" Moore's testimony. There is certainly evidence that Moore would not have confessed if Thompson had not confessed. Thereafter, however, Moore was herself convicted of aggravated robbery. Only after she had served her sentence did she testify at Thompson's trial. Thompson has alleged no facts to show the requisite causation between his confession and her ultimate testimony.

Whether or not Moore had been convicted, the state could have subpoenaed her and forced her to appear at Thompson's trial. Moore might have invoked her Fifth Amendment right against self-incrimination at Thompson's trial had she not already been tried, convicted and punished. But there is neither an allegation nor any evidence to indicate that she would have done so—or that, if she had, she would not have been afforded immunity.

## I. WAS THE STATE BARRED FROM SEEKING THE DEATH PENALTY BECAUSE IT HAD MADE AN OFFER OF A LIFE SENTENCE?

Thompson finally contends that the state was precluded from seeking the death penalty because it had previously offered a plea bargain of life imprisonment in exchange for a plea of guilty. This offer was made soon after the case was remanded from the Court of Criminal Appeals for retrial. The record reflects that Thompson did not accept this offer and that he instead counter offered thirty, and then fifty or sixty, years. A few days before trial, Thompson offered to plead guilty in exchange for life imprisonment. The prosecutor then informed Thompson that the offer of life imprisonment had been withdrawn and that Thompson's offer was rejected. The record supports the state court's conclusion that no plea bargain was reached because at no time did both the state and Thompson reach mutual assent.

The real issue here is whether the state was precluded from withdrawing its offer once made absent some judicially reviewable reason that would support the withdrawal. The Supreme Court has upheld the validity of plea bargaining[42] even in capital cases.[43] To hold that an offer of a life sentence precludes the state from seeking the death penalty at trial would in effect preclude the state from bargaining. Once the state had made such an offer, the defendant could go to trial with the certainty that, even if convicted, he could not be sentenced to death unless some circumstance developed after the offer was made to make his crime more egregious or the evidence against him more certain.

In the absence of any allegation or evidence of a racially invidious or other unconstitutional motive, the Supreme Court's decisions on plea bargaining preclude our re-

**40.** 392 U.S. 219, 88 S.Ct. 2008, 20 L.Ed.2d 1047 (1968).

**41.** *Id.* at 224, 88 S.Ct. at 2011 (emphasis added). *See also Oregon v. Elstad,* 470 U.S. 298, 316, 105 S.Ct. 1285, 1297, 84 L.Ed.2d 222 (1985).

**42.** *See, e.g., Boykin v. Alabama,* 395 U.S. 238, 242–44, 89 S.Ct. 1709, 1711–13, 23 L.Ed.2d 274

(1969); *McCarthy v. United States,* 394 U.S. 459, 466, 89 S.Ct. 1166, 1171, 22 L.Ed.2d 418 (1969).

**43.** *See North Carolina v. Alford,* 400 U.S. 25, 31, 91 S.Ct. 160, 164, 27 L.Ed.2d 162 (1970); *Brady v. United States,* 397 U.S. 742, 746–48, 755, 90 S.Ct. 1463, 1468–69, 1472, 25 L.Ed.2d 747 (1970).

view of the sufficiency of the state's reasons for withdrawing its offer.[44]

For these reasons the district court's denial of the application for writ of habeas corpus is affirmed and Thompson's request for a stay of execution is denied.

---

44. *See Bordenkircher v. Hayes,* 434 U.S. 357, 364–65, 98 S.Ct. 663, 668–69, 54 L.Ed.2d 604 (1978); *cf. McCleskey v. Kemp,* — U.S. —, ——, 107 S.Ct. 1756, 1777–78, 95 L.Ed.2d 262 (1987).