IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 06-70003

_____

Derrick SONNIER,

Petitioner-Appellant,

versus

NATHANIEL QUARTERMAN, Director,
Texas Department of Criminal Justice,
Correctional Institutions Division,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Texas

_____

United States Court of Appeals
Fifth Circuit

**F I L E D**

January 22, 2007

Charles R. Fulbruge III
Clerk

Before HIGGINBOTHAM, BENAVIDES, and DENNIS,
Circuit Judges.

DENNIS, Circuit Judge:

Petitioner Derrick Sonnier, a Texas death row
inmate, filed a petition for a writ of habeas
corpus under 28 U.S.C. § 2254 with the United
States District Court for the Southern District of

1

Texas on June 4, 2004 and amended it on August 5, 2004. Respondent Doug Dretke[1] filed a motion for summary judgment on July 14, 2005. The district court granted respondent's motion for summary judgment and denied Sonnier's petition for a writ of habeas corpus in a memorandum and order dated January 23, 2006. It additionally denied a Certificate of Appealability (COA) sua sponte. Sonnier now seeks a COA from this court.

## I.  Background

Sonnier was convicted of the capital murder of Melody Flowers and her son, Patrick Flowers, by a Texas jury.[2] At sentencing, Sonnier's attorneys, pursuant to his wishes and instructions, did not

---

[1] On June 1, 2006, Nathaniel Quarterman succeeded Doug Dretke, the previously named respondent-appellee, as Director of the Correctional Institutions Division of the Texas Department of Criminal Justice. Quarterman is substituted as a party. Fed. R. App. P. 43(c)(2).

[2] Specifically, the jury found Sonnier guilty of intentionally and knowingly killing the two in the same criminal transaction in violation of Texas Penal Code § 1903.

2

present any mitigation evidence. Sonnier, on the record, confirmed that he had consistently instructed his attorneys not to present any mitigation evidence. Based upon the jury's answers to interrogatories under the 1991 Texas capital sentencing scheme, the trial court sentenced Sonnier to death.

Sonnier's motion for new trial was denied, and his conviction and sentence were affirmed by the Texas Court of Criminal Appeals. See Sonnier v. State, 913 S.W. 2d 511 (Tex. Crim. App. 1995). Sonnier instituted state habeas proceedings in which his petition was denied. See Ex Parte Sonnier, No. 57,256-01 (Tex. Crim. App. Nov. 5, 2003)(unpublished). Sonnier then filed his federal habeas petition in the district court. The district court granted the State's motion for summary judgment, dismissed Sonnier's petition in

its entirety, and denied a COA. Sonnier now requests a COA from this court, claiming that: (1) his trial counsel was ineffective for (a) failing to investigate for mitigation evidence and for (b) failing to present mitigating evidence at the punishment phase of his trial; (2) he was constitutionally entitled, under Simmons v. South Carolina, 513 U.S. 154 (1994), to inform the jury that, if sentenced to life imprisonment, rather than death, he would not be eligible for parole for 35 years; and (3) Texas Code of Criminal Procedure article 37.071, as amended effective September 1, 1991, is unconstitutional.

## II.  Legal Standard

Our review of Sonnier's request for a COA is governed by the Antiterrorism and Effective Death Penalty Act ("AEDPA"), which provides that a petitioner can appeal a district court's dismissal

of a petition under 28 U.S.C. § 2254 only if either the district court or this court issues a COA. See 28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1). A court can issue a COA "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The Supreme Court has explained that under this standard, a COA should issue only when the petitioner demonstrates "that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." Miller-El v. Cockrell, 537 U.S. 322, 327 (2003). Thus, a petitioner seeking a COA must show that "'reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.'" Id. at 338 (quoting

5

Slack v. McDaniel, 529 U.S. 473, 484 (2000)).

When determining whether a petitioner has established an entitlement to a COA, we do not fully consider the underlying factual and legal bases in support of the petitioner's claims. Id. at 336. Rather, this court conducts only a limited, "threshold inquiry into the underlying merit of [the petitioner's] claims." Id. at 327. Finally, in capital cases, doubts over whether a COA should issue are to be resolved in favor of the petitioner. See Newton v. Dretke, 371 F.3d 250, 254 (5th Cir. 2004).

### III. Discussion

### A. Ineffective Assistance of Counsel

Sonnier first asserts that he is entitled to a COA because his trial counsel, Wilford Anderson and Stephen Morris, were ineffective during the punishment phase of his trial for failing to: (1)

6

investigate for mitigating evidence; and (2) present known available mitigating evidence.

The Sixth Amendment guarantees a criminal accused the right to assistance of counsel; "[t]he right to counsel is the right to the effective assistance of counsel." McMann v. Richardson, 397 U.S. 759, 771 n. 14 (1970). The Supreme Court has explained the Sixth Amendment right to counsel as follows: "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland v. Washington, 466 U.S. 668, 686 (1984). Strickland provides a two-pronged test to analyze its provided benchmark:

(1) the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning

7

> as the "counsel" guaranteed by the Sixth Amendment;...
>
> (2) the defendant must show that the deficient performance prejudiced his defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

Id. at 687. Both prongs must be satisfied for a defendant to carry his burden and thus, succeed on an ineffective assistance of counsel claim.

As to the first prong, deficient performance, we measure the adequacy of counsel's performance against an objective standard of reasonable performance based on accepted professional norms. See Rompilla v. Beard, 545 U.S. 374, 380 (2005) (citing Strickland, 466 U.S. at 688). "Because of the difficulties inherent in making the evaluation, the court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome

8

the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Strickland, 466 U.S. at 689.

As to the second prong, prejudice to the defense, a petitioner must show that there is a reasonable probability that, absent counsel's deficient representation, the outcome of the proceedings would have been different. Rompilla, 545 U.S. at 390 (citing Strickland, 466 U.S. at 694). A reasonable probability is a probability sufficient to undermine confidence in the outcome of the trial. Strickland, 466 at U.S. at 694. To assess prejudice during the sentencing phase of a capital proceeding, the court "reweigh[s] the evidence in aggravation against the totality of the available mitigating evidence." Wiggins v. Smith, 539 U.S. 510, 534 (2003). To find prejudice, there must be a reasonable probability

9

that, absent the error, the sentencer would have concluded that the balance of aggravating and mitigating circumstances did not warrant death. Strickland, 466 U.S. at 695.

With these standards in mind, we turn to Sonnier's claims of ineffective assistance of counsel. Sonnier asserts that his trial attorneys' performance was deficient in two respects: (1) they failed to investigate for mitigation evidence; and (2) they failed to present mitigation evidence. This deficient performance, he alleges, prejudiced his defense.

Failure to Investigate for Mitigation Evidence

Sonnier first asserts that his trial attorneys were deficient because they failed to investigate for mitigation evidence. Sonnier and the State disagree as to the exact extent of counsel's investigatory efforts. Sonnier's current

attorneys, in conclusory fashion, urge that his trial attorneys failed to conduct any investigation for mitigation evidence, which they claim resulted in a verdict unworthy of confidence. The state's attorneys, by contrast, assert that Sonnier's allegation of failure to investigate fails. As they argue, "Counsel's investigation led him to believe that he should present evidence. Counsel asked Sonnier to allow them to offer the testimony. Indeed the witnesses were in the courtroom ready to testify. After counsel had investigated and settled upon a strategy, the decision not to proceed was Sonnier's." They further allege that Sonnier's trial counsel contacted his family members and solicited their attendance at his trial.

The record reveals that one of Sonnier's trial attorneys, Stephen Morris, prepared a sworn

11

affidavit that stated that:

(1) Sonnier refused to cooperate in any way to try to fashion a defense and that Sonnier had become belligerent towards one of his attorneys for his efforts to convince Sonnier to mount one;

2) he asked Sonnier every day to speak with his attorneys to help them prepare a defense and that Sonnier refused;

(3) the attorneys sent a private investigator to talk to Sonnier, hoping that he [the investigator] could foster a relationship with Sonnier that would lead to Sonnier's cooperation, but that Sonnier refused to speak to him;

(4) Sonnier, insisting that he did not hang around with any of his neighbors, refused to provide names of other people who lived at the

12

apartment complex where he and the victim resided who could have been present in the complex when the murders occurred;

(5) Sonnier's relatives, whom the attorneys wanted to call as witnesses should Sonnier be found guilty, were present at the trial at the request of co-counsel, Anderson; and

(6) Sonnier objected to his attorneys' speaking with his family members about mitigation evidence.

The state habeas court found the affidavit of Morris to be credible.

To determine whether counsel's performance was deficient, we must measure it against an objective standard of reasonable performance based on accepted professional norms. See Rompilla, 545 U.S. at 380 (citing Strickland, 466 U.S. at 688). The Supreme Court, in Strickland, addressed an

ineffective assistance claim based on an attorney's failure to investigate for and present mitigation evidence. Relying upon the guideposts of the American Bar Association's Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases,[3] it noted that counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. Strickland, 466 U.S. at 691.

Applying that standard, we conclude that the trial attorneys stopped short of making a reasonable investigation for purposes of uncovering relevant mitigating evidence that could have been useful in reaching two goals that it was

---

[3] The version of these Guidelines in place at the time of Sonnier's trial provided that "investigation for preparation of the sentencing phase should be conducted regardless of any initial assertion by the client that mitigation is not to be offered." American Bar Association, Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases § 11.4.1c (1989).

14

their duty to pursue: (1) fully informing Sonnier of all available mitigating evidence and their opinion of its potential effectiveness based on their professional knowledge and experience; and (2) persuading the sentencing jury that Sonnier's moral culpability was not sufficient to warrant the death penalty.

According to the record prepared for our review, the trial attorneys did not talk to Sonnier's family and acquaintances at the length or in the depth required for these purposes. If any of these persons could have presented or directed counsel to highly effective mitigation evidence, it appears unlikely that the truncated investigation of the family and other witnesses by Sonnier' trial attorneys would have uncovered it. Sonnier's refusal to consent to their undertaking more extensive and in-depth discussions with his

15

family and acquaintances to determine the nature and extent of the mitigation evidence available was not reasonable grounds for their failure to do so.

Having found deficient performance with respect to Sonnier's attorneys failure to investigate for mitigation evidence, we now turn to the second prong of the Strickland analysis, prejudice. Sonnier carries the burden of showing that his trial attorneys' ineffective investigation for mitigation evidence prejudiced his defense. After reviewing the mitigation evidence that Sonnier's current counsel now contend that his trial attorneys failed to discover and present, we conclude that the requisite showing of such prejudice has not been made.

Sonnier presents the affidavits of Rosa

16

Christine Law, his mother, and Cynthia Patterson, his investigator, to show the nature and extent of the available mitigation evidence. Law's sworn statement is that she was never approached by or interviewed by Sonnier's attorneys or investigator regarding any potential testimony in Sonnier's favor. Instead, she attested, she had one very brief telephone conversation with trial attorney Anderson a few days prior to trial regarding locating a witness. Law explains that she was never interviewed regarding her son's background or personal history nor was she ever asked to testify about it, though she was available and willing to do so. Had she testified, she would have explained that Sonnier "was never a problem," "was respectful to everyone," and "is a kind person who loves children." Further, she would have testified that she could not believe he would

17

ever harm a child and that when speaking to her son shortly after his arrest, he was "very distraught and just 'out of it.'" Additionally, Law would have spoken of visiting her son's apartment a week prior to the murders where she met Melody Flowers, one of the victims, and noticed no problems between her son and Flowers. She also noted that "everyone went in and out of each other's apartments without knocking and appeared to be more like brothers and sisters, than neighbors."

Sonnier's investigator, Cynthia Patterson, explains in her affidavit that Roxanne Saunders, Rose Bias, Hattie Buckley, and Paul Goodwin were willing to come to court and testify regarding Sonnier's good character but were not interviewed or asked to testify. Additionally, Patterson states that Shirley Goodwin, Carol DeJean, Sarah

18

Lewis, and Jackie Bourne were present, available, and willing to testify at Sonnier's trial.

According to the investigator's affidavit, Shirley Goodwin is Sonnier's step-mother and, though she recalled speaking to Sonnier's attorneys a couple of times during the trial in brief, approximately two-minute conversations, she could not recall being asked to testify or being asked any questions regarding Sonnier's background or personal history. Goodwin was never interviewed prior to trial by Sonnier's attorneys and could not recall being asked for the names of character witnesses. If asked, she would have testified that Sonnier was kind, respectful, and loving, that she had never witnessed violent or aggressive behavior on his part, that he was kind to his girlfriend and her children, and that he loved Patrick Flowers, one of the victims, and was

19

not capable of hurting him.

Patterson's affidavit also states that Carol DeJean is Sonnier's aunt who was present at his trial but, despite speaking to his attorneys in general conversation, was not asked to testify. Had she been asked to do so, she would have testified that Sonnier was even-tempered, mild-mannered, and well-mannered. Further, she would have expressed that he loved children and was very kind to her children. Additionally, she would have stated that she had never heard Sonnier raise his voice and never witnessed him do anything that would indicate that he was capable of violence. She noted that she would never believe that Sonnier committed this type of offense.

Sarah Lewis, Sonnier's aunt, is also referenced in Patterson's affidavit. Patterson explains that Lewis did not speak with the

attorneys and that no one asked her to testify. She described Sonnier as a person who loved kids, loved everybody, and stated that he is easy to get along with, would not harm anybody, and would let someone harm him instead of harming them to protect himself. She also stated that he was good with his girlfriend's kids and Melody Flowers's children.

Finally, Patterson's affidavit presents the statements of Jackie Bourne, Sonnier's cousin, who asked one of the attorneys whether Sonnier would be allowed to have witnesses testify on his behalf. The attorney explained that Sonnier did not want testimony on his behalf. Had she been asked to testify, Bourne would have described Sonnier as a sweet person who was not a problem. Further, she would have stated that she does not believe Sonnier is capable of committing this type

21

of offense and has never displayed any indications

of violence.  She also would have explained that

she never saw him act inappropriately towards

females and that he went to school, did his work,

and stayed at home.

Although this mitigation evidence, if

discovered and presented, would have shown some

favorable aspects of Sonnier's character, after

re-weighing the aggravating evidence of record[4]

against it, we do not find that there is a

reasonable probability that its introduction would

have caused the jury to decline to impose the

[4] The record shows that Melody Flowers, the adult victim, was a neighbor of Sonnier.  Prior to her death, the evidence shows that Sonnier, on more than one occasion, intruded into her apartment without her knowledge or consent and scared her.  Upon doing so, he would laugh and taunt her for her fear.  The precise cause of Melody Flowers's death is unknown; it could have been from any of the four harms she endured: (1) the bludgeoning with a hammer upon her head; (2) the asphyxia due to manual and ligature strangulation; (3) the stomping upon her chest and neck; (4) or the two stabbings to her chest.  Patrick Flowers, the child victim, died from being stabbed twice in the chest, one of which penetrated his heart; he was thereafter submerged in a bathtub.

22

death penalty in this case; nor does the failure of trial counsel to discover and present it undermine our confidence in the jury's determination of the sentence.

Our conclusion in this regard is illumined, although not necessarily controlled by, a comparison with cases in which the Supreme Court determined whether there was a reasonable probability that the trial attorneys' failure to discover and present mitigation evidence had affected the outcome of the sentencing proceedings. For example, in Williams v. Taylor, 529 U.S. 362,395-96, the Court held that the defendant's trial counsel were prejudically ineffective when they failed to discover or introduce mitigation evidence in the form of extensive records that graphically described petitioner's:

23

(1) nightmarish childhood, including grossly unsanitary living conditions; (2) parents' alcoholism, as well as their convictions and incarceration for criminal neglect of their children; (3) severe and repeated beatings by his parents; (4) commitments to social services bureau; (5) placements in abusive foster homes; and his (6) borderline mental retardation. Similarly, in Rompilla v. Beard, 545 U.S. 374, 391-91, the defendant's attorney was prejudicially ineffective because of her failure to secure and review a prior conviction file, which included evidence of petitioner's: (1) severely alcoholic parents; (2) mother's chronic drunkenness during her pregnancy; (3) drinking problems; (4) father's overt abuse towards his mother; (5) infidelity in respect to his mother; (5)parents' violent fights; (6) father's verbal and physical abuse of him and

24

his siblings, including striking them with his hands and fists, leather straps, belts and sticks, in addition to locking them in a pen, filthy with dog excrement; (7) horrific living conditions, including no indoor plumbing, sleeping in the attic with no heat, no clothes and attending school in rags; and (8) petitioner's mental retardation.  On the other hand, in Woodford v. Visciotti, 537 U.S. 19, 26 (2002), the United States Supreme Court ruled that the California Supreme Court's rejection of an ineffective assistance of counsel claim was not objectively unreasonable.  In that case, counsel failed to discover and present evidence of Woodford's (1) dysfunctional family in which he suffered continual psychological abuse; (2) low self-esteem; (3) depression; (4) club feet; (5) feelings of inadequacy, incompetence, inferiority;

and (6) 20 changes of residences.  Id.

The weight of the failure to discover mitigation evidence by Sonnier's trial counsel is comparable to that of the neglect urged unsuccessfully as grounds for Strickland's ineffective assistance claim. There, the Supreme Court explained, "At most this evidence shows that numerous people who knew the respondent thought he was generally a good person and that a psychiatrist and a psychologist believed he was under considerable emotional stress that did not rise to the level of extreme disturbance.  Given the overwhelming aggravating factors, there is no reasonable probability that the omitted evidence would have changed the conclusion that the aggravating circumstances outweighed the mitigating circumstances and, hence, the sentence imposed."  Strickland, 466 U.S. at 700.

26

For these reasons, we conclude that Sonnier has failed to carry his burden under <u>Strickland</u> of showing that there was a reasonable probability that his capital sentencing jury would have imposed a life imprisonment sentence rather than the death penalty if his trial attorneys had investigated more diligently for mitigation evidence. Accordingly, we conclude that he has not shown that the error prejudiced him or rendered his penalty trial unreliable, and we must therefore deny his request for a COA in this respect.

### Failure to Present Mitigation Evidence

Sonnier's current counsel argue additionally that his trial attorneys were ineffective, due to their failure to present any mitigation evidence. They argue that Sonnier's family and friends were present at his trial and ready and willing to

testify on his behalf, yet the defense attorneys did not present them. By contrast, the State argues that because Sonnier's trial attorneys were acting upon his instructions, Sonnier cannot now complain of their inaction.

The record shows that Sonnier directed his attorneys not to present mitigation evidence. Trial attorney, Stephen Morris's, affidavit states that:

(1) upon the guilty verdict, the attorneys called for a recess, during which they urged Sonnier to reconsider and allow them to call witnesses, but he refused;

(2) Morris spoke with Sonnier, as he would have had Sonnier been his own brother, in an effort to convince Sonnier to allow his attorneys to put mitigation evidence before the jury on his behalf, but he

28

refused;

(3) Sonnier's other attorney, Mr. Anderson, informed the court, on the record, that Sonnier would not allow counsel to call witnesses on his behalf;

(4) Sonnier, upon inquiry by the trial court, openly admitted that he had discussed his decision with counsel and was instructing them not to present evidence at punishment.

Furthermore, the record also shows that Sonnier was informed of the advisability of presenting such mitigation evidence. Morris's affidavit states, "I spoke with him as earnestly as I could concerning the critical need to have the jury hear from his relatives and friends in his defense." Additionally, the trial court transcript shows the following colloquy by Mr. Anderson, one of

29

Sonnier's attorneys:

> Mr. Morris and I have discussed presenting witnesses on behalf of Mr. Sonnier, those witnesses being various family members of Mr. Sonnier. We have advised Mr. Sonnier of our desire to present those witnesses on his behalf in his best interest, especially at this part of the trial, punishment phase of trial. Mr. Sonnier has advised us that he does not want us to put on any witnesses or put forth any evidence or testimony in regards to the defense at this stage of the trial. We have advised him it is our opinion that he should do so, but he has indicated that he does not want to have any witnesses testify in his behalf. Had we called witnesses to testify in his behalf, they would testify as to their knowledge of Mr. Sonnier, their relationship with Mr. Sonnier, the length of time they have known him. They would testify as to the type of person Mr. Sonnier is in a positive sense and would, in our opinion, present evidence that would help mitigate any punishment that may be assessed by the jury, allow them to consider some evidence of mitigation in determining how they would answer special issue number two.

After hearing this recitation, the trial judge spoke directly to the defendant, asking, "Mr.

Sonnier, have you discussed this with your attorneys and are you instructing them not to call witnesses in your behalf in the punishment stage of trial?" Sonnier replied, "Yes, sir, Your Honor, I am." On appeal, Sonnier does not dispute that he was informed of the importance of presenting mitigation evidence.

Under Fifth Circuit case law, "when a defendant blocks his attorney's efforts to defend him, including forbidding his attorney from interviewing his family members for purposes of soliciting their testimony as mitigating evidence during the punishment phase of the trial, he cannot later claim ineffective assistance of counsel." Roberts v. Dretke, 356 F.3d 632, 638 (5th Cir. 2004); see also Autry v. McKaskle, 727 F.2d 358, 361-62 (5th Cir. 1984); United States v.

31

Masat, 896 F.2d 88, 93 (5th Cir. 1990);[5] Dowthitt

v. Johnson, 230 F.3d 733 (5th Cir. 2000).[6]

---

[5] The Masat court explained, "...[I]t is apparent that we are being asked to permit a defendant to avoid conviction on the ground that his lawyer did exactly what he asked him to do. That argument answers itself." United States v. Masat, 896 F.2d 88, 93 (5th Cir. 1990). The court then cited the Eleventh Circuit case of Mulligan v. Kemp, 771 F.2d 1436 (11th Cir. 1985), "...[W]e must give great deference to the choices which are made under the explicit direction of the client...[I]f counsel is commanded by his client to present a certain defense, and if he does thoroughly explain the potential problems with the suggested approach, then his ultimate decision to follow the client's will may not be lightly disturbed." Id. at 1441-42. But see Hardwick v. Crosby, 320 F.3d 1127 n. 215 (11th Cir. 2003), where the Eleventh Circuit provided, "Even if Hardwick [the defendant] did ask Tassone [his attorney] not to present mitigating evidence, . . . Tassone had a duty to Hardwick at the sentencing phase to present available mitigating witnesses as Hardwick's only defense against the death penalty.

[6] This is consistent with other federal circuits' jurisprudence, as well. See e.g., Shelton v. v. Carroll, 464 F.3d 423 (3d Cir. 2006); Campbell v. Polk, 447 F.3d 270 (4th Cir. 2006)(no ineffective assistance of counsel where defendant strongly insisted that his attorney not call his mother, even after he was advised of the need for family witnesses); Frye v. Lee, 235 F.3d 897, 906-07 (4th Cir. 2000)(no ineffective assistance of counsel where the attorney failed to present supplemental witnesses during the sentencing phase where the defendant adamantly refused to allow counsel to contact members of the defendant's family or engage their services in obtaining mitigating evidence, despite repeated requests by defense counsel to do so); Jones v. Page, 76 F.3d 831 (7th Cir. 1996)(defendant could not complain of ineffective assistance of counsel based on his attorney's failure to call defendant's grandmother as a mitigation witness when the defendant personally instructed the attorney not to do so); Hall v. Washington, 106 F.3d 742 (7th Cir. 1997)(defendant waives his claim for ineffective assistance of counsel if his refusal to cooperate causes his attorney's deficient performance); Williams v. Woodford, 384 F.3d 567 (9th Cir. 2004)(no ineffective assistance of counsel when, among other things, the defendant specifically

Furthermore, even if this Fifth circuit precedent could be found contrary to or an unreasonable application of the Supreme Court's decisions, Sonnier's ineffective assistance claim regarding his trial attorneys' failure to present mitigating evidence would still fail. When directly applying the second prong of the Strickland analysis to the alleged ineffectiveness of Sonnier's trial counsel in failing to present the mitigation evidence shown to have been available, we find that it necessarily duplicates and reaches the same result as the foregoing analysis of his failure to investigate claim. Given the overwhelming aggravating factors, there is no reasonable probability that the omitted evidence would have changed the conclusion that

requested that no witnesses be called); James v. Gibson, 211 F.3d 543 (10th Cir. 2000)(no ineffective assistance of counsel where defendant directly influenced counsel by requesting that his grandfather not be called as a witness).

the aggravating circumstances outweighed the mitigating circumstances and, hence, warranted the capital punishment sentence that was imposed.

## B. Due Process Violation in Voir Dire

Sonnier's second claim, based upon Simmons v. South Carolina, 512 U.S. 154 (1994), is that he was deprived of due process of law when, during jury selection, the trial court refused to allow the defense to inform the jury that if convicted, Sonnier would be ineligible for parole until he had served 35 years. In Simmons, the court held that where a state argues in favor of the death penalty based upon the defendant's future dangerousness, the defendant must be allowed to respond to that argument with evidence showing that if sentenced to life in prison, he will not be eligible for parole. Simmons, 512 U.S. at 165.

Simmons does not apply to the facts of this

case.  Unlike the South Carolina sentencing scheme at issue in Simmons, the Texas death penalty statutes under which Sonnier was sentenced did offer life imprisonment without parole as a possible sentence.  Instead, they provided only for sentences of death or life imprisonment with the possibility of parole.  Sonnier's argument, as he concedes, is foreclosed by Supreme Court and Fifth Circuit precedent.  See Ramdass v. Angelone, 530 U.S. 156, 169 (2000) ("Simmons applies only to instances where, as a legal matter, there is no possibility of parole if the jury decides the appropriate sentence is life in prison."); Green v. Johnson, 160 F.3d 1029, 1045 (5th Cir. 1998); Wheat v. Johnson, 238 F.3d 357, 362 (5th Cir. 1999) (finding Simmons inapplicable to the Texas sentencing scheme); Miller v. Johnson, 200 F.3d 274, 290 (5th Cir. 2000)("[B]ecause Miller would

have been eligible for parole under Texas law if sentenced to life, we find his reliance on <u>Simmons</u> unavailing."); <u>Hughes v. Johnson, 191 F.3d 607, 617 (5th Cir. 1999)</u>.  Accordingly, we conclude that Sonnier's case does not fall within the scope of <u>Simmons</u> and that a COA cannot be issued on the grounds he asserts.

## C. Constitutionality of Texas Code of Criminal Procedure article 37.071

Sonnier's final argument is that the Texas death penalty statute, <u>Texas Code of Criminal Procedure article 37.071</u>, violates the Eighth and Fourteenth Amendments.  The Texas legislature amended article 37.071, effective September 1, 1991, by removing the deliberateness[7] and provocation special issues and adding a general

---

[7] The amended statute retains the deliberateness special issue for defendants found guilty of capital murder under the law of the parties.

36

mitigation special issue.[8]

Under the 1991 version of the statute applicable here, the jury is first asked whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society. See TEX. CODE CRIM. PRO. ANN. art. 37.071, Section 2(b)(1).[9] The court must charge the jury that in deliberating on that interrogatory, it shall consider all evidence admitted at the guilt or innocence stage and the punishment stage, including evidence of the defendant's background or character or the circumstances of the offense that militates for or mitigates against the imposition of the death penalty. See TEX. CODE

---

[8] This addition requires a jury to consider all mitigation evidence and allows a jury to impose a life sentence if the mitigation evidence so warrants.

[9] The state must prove this issue beyond a reasonable doubt, and the jury shall return a special verdict of "yes" or "no." See TEX. CODE CRIM. PRO. ANN. art. 37.071, Section 2(c).

CRIM. PRO. ANN. art. 37.071, Section 2(d)(1). If the jury returns a unanimous,[10] affirmative finding as to the first issue, the court shall then instruct the jury to answer the following issue: Whether, taking into consideration all of the evidence, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed. See TEX. CODE CRIM. PRO. ANN. art. 37.071, Section 2(e)(1). The court must charge the jury that in answering that interrogatory, it must consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness. See TEX. CODE CRIM. PRO. ANN. art. 37.071, Section

---

[10] See TEX. CODE CRIM. PRO. ANN. art. 37.071, Section 2(d)(2).

38

2(f)(4).  If the jury then returns a unanimous,[11]

negative finding, the court shall sentence the

defendant to death.  See TEX. CODE CRIM. PRO. ANN.

art. 37.071, Section 2(g).  Sonnier was sentenced

under the amended version of the article and now

challenges its constitutionality.

*I. The Eighth Amendment Claim*

In its last term, the United States Supreme

Court, referencing Furman v. Georgia, 408 U.S. 238

(1972) and Gregg v. Georgia, 428 U.S. 153 (1976),

explained that a state capital sentencing system

must satisfy two requirements in order to be

constitutionally permissible.  Kansas v. Marsh,

126 S.Ct. 2516, 2524-25 (2006).  First, it must

"rationally narrow the class of death-eligible

defendants."  Id. at 2524.  Second, it must

---

[11] See TEX. CODE CRIM. PRO. ANN. art. 37.071, Section 2(f)(2).

"permit a jury to render a reasoned, individualized sentencing determination based on a death-eligible defendant's record, personal characteristics, and the circumstances of his crime." Id. at 2524-25. "So long as a state system satisfies these requirements, our precedents establish that a State enjoys a range of discretion in imposing the death penalty. . . ." Id. at 2525.

Sonnier argues that "the amended version of article 37.071 regresses from the safeguards of the former version and renders the imposition of the death sentence arbitrary and erratic in violation of the Eighth Amendment's prohibition of cruel and unusual punishment." In essence, Sonnier's argument is that the removal of the deliberateness special issue renders the Texas capital sentencing system constitutionally

40

impermissible because, without consideration of whether the defendant's actions in committing the crime were deliberate, the sentencing scheme fails to rationally narrow the class of death-eligible defendants.  We do not agree.

In <u>Kansas v. Marsh</u>, the Supreme Court addressed the constitutionality of the Kansas capital sentencing scheme.  Under <u>KAN. STAT. ANN. § 21-3439</u>, the death penalty is an option only after a defendant is convicted of capital murder.  According to <u>KAN. STAT. ANN. § 21-4624(e)</u>, a defendant becomes eligible for imposition of the death penalty as follows:

> If, by unanimous vote, the jury finds beyond a reasonable doubt that <u>one</u> or more of the aggravating circumstances enumerated in <u>K.S.A. 21-4625</u> and amendments thereto exist and, further, that the existence of such aggravating circumstances is not outweighed by any mitigating circumstances which are found to exist, the defendant shall be sentenced

41

to death; otherwise the defendant shall be sentenced as provided by law.  (emphasis added).

One of the aggravating circumstances enumerated in KAN. STAT. ANN. § 21-4625[12] is that "the defendant knowingly or purposely killed or created a great risk of death to more than one person."  KAN. STAT. ANN. § 21-4625(2).

The Court found that "[t]he Kansas death penalty statute satisfies the constitutional

---

[12] The complete list of exclusive aggravating factors is as follows:
(1) The defendant was previously convicted of a in which the defendant inflicted great bodily harm, disfigurement, dismemberment or death on another.
(2) The defendant knowingly or purposely killed or created a great risk of death to more than one person.
(3) The defendant committed the crime for the defendant's self or another for the purpose of receiving money or any other thing of monetary value.
(4) The defendant authorized or employed another person to commit the crime.
(5) The defendant committed the crime in order to avoid or prevent a lawful arrest or prosecution.
(6) The defendant committed the crime in an especially heinous, atrocious or cruel manner.
(7) The defendant the crime while serving a sentence of imprisonment on conviction of a felony.
(8) The victim was killed while engaging in, or because of the victim's performance or prospective performance of, the victim's duties as a witness in a criminal proceeding.

mandates of <u>Furman</u> and its progeny because it rationally narrows the class of death-eligible defendants." <u>Marsh, 126 S.Ct. at 2526</u>. As it explained:

> Kansas' procedure narrows the universe of death-eligible defendants consistent with Eighth Amendment requirements. Under Kansas law, imposition of the death penalty is only an <u>option</u> after a defendant is convicted of capital murder, which requires that one or more specific elements beyond intentional premeditated murder be found. Once convicted of capital murder, the defendant becomes <u>eligible</u> for the death penalty only if the State seeks a separate sentencing hearing, and proves beyond a reasonable doubt the existence of one or more statutorily enumerated aggravating circumstances. <u>Id.</u>

The Texas capital sentencing scheme bears some striking similarities to the Kansas scheme at issue in <u>Marsh</u>. First, under both Texas law and Kansas law, the death penalty is only an option for those defendants convicted of the crime of

capital murder.[13]   Under Texas law, a person commits capital murder if he commits murder[14] and:

(1) the person murders a peace officer or fireman who is acting in the lawful discharge of an official duty and who the person knows is a peace officer of fireman;

(2) the person intentionally commits the murder in the course of committing or attempting to commit kidnaping, burglary, robbery, aggravated sexual assault, arson, obstruction or retaliation, or terroristic threat under Section 22.07(a)(1), (3), (4), (5), or (6);

(3) the person commits the murder for remuneration or the promise of

---

[13] Compare TEX. CODE CRIM. PRO. art. 37.071 with KAN. STAT. ANN. § 21-3439.

[14] Under Texas law, a person commits murder if he:

(1) intentionally or knowingly causes the death of an individual;

(2) intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual; or

(3) commits or attempts to commit a felony, other than manslaughter, and in the course of and in furtherance of the commission or attempt, or in immediate flight from the commission or attempt, he commits or attempts to commit an act clearly dangerous to human life that causes the death of an individual.
V.T.C.A, Penal Code § 19.02(b)(1).

44

remuneration or employs another to commit the murder for remuneration or the promise of remuneration;

(4) the person commits the murder while escaping or attempting to escape from a penal institution;

(5) the person, while incarcerated in a penal institution, murders another:

(A) who is employed in the operation of the penal institution; or

(B) with the intent to establish, maintain, or participate in a combination or in the profits of a combination;

(6) the person:

(A) while incarcerated for an offense under this section or Section 19.02, murders another; or

(B) while serving a sentence of life imprisonment or a term of 99 years for an offense under Section 20.04, 22.021, or 29.03, murders another;

(7) the person murders more than one person:

(A) during the same criminal transaction; or

(B) during different criminal transactions but the murders are committed pursuant to the same scheme or course of conduct;

(8) the person murders an individual under six years of age; or

(9) the person murders another person in retaliation for or on account of the service or status of the other person as a judge or justice of the supreme court, the court of criminal appeals, a court of appeals, a district court, a criminal district court, a constitutional county court, a statutory county court, a justice court, or a municipal court.

V.T.C.A. § 19.03. This distinction between capital murder and other categories of murder is the initial narrowing of the class of persons who may potentially face the death penalty.

Second, under both the Texas and Kansas schemes, once a defendant is convicted of capital murder, he becomes <u>eligible</u> for the death penalty only if the State seeks a separate sentencing hearing. <u>Compare</u> <u>TEX. CODE CRIM. PRO. art. 37.071</u> with <u>KAN. STAT. ANN. § 21-4706.</u>

Additionally, under both state schemes, the

government must prove beyond a reasonable doubt the existence of one or more statutorily enumerated aggravating circumstances. Under the Texas scheme, a defendant will be eligible for the death penalty only upon a unanimous jury finding that "there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." TEX. CODE CRIM. PROC. ANN. art. 37.071 (1991). This is somewhat analogous to KAN. STAT. ANN. § 21-4624, which requires the existence of <u>one</u> or more aggravating circumstances for death sentence eligibility.

Consequently, we conclude that the Texas scheme, like the one in place in Kansas, is constitutionally valid under the rationale provided in <u>Marsh</u>, in that it rationally narrows the classes of defendants determined to be

47

eligible and selected for the death penalty.  The Texas capital sentencing scheme, like the Kansas system, limits the death penalty, first, to defendants convicted of  capital murder under one or more of the aggravating circumstances inherent in the definition of that crime, and, second, to those capital murderers who are determined to be eligible for the death penalty by virtue of the jury's finding of an additional aggravating circumstance in respect to their character, background, and crime, i.e., the probability that they will commit criminal acts of violence that would constitute a continuing threat to society.

In Thompson v. Lynaugh, 821 F.2d 1054 (5th Cir. 1987), this court addressed an argument that the pre-1991 version of Article 37.071 failed to narrow the class of death-eligible defendants. Specifically, Thompson argued that the

"deliberateness" special issue duplicated the finding of an "intentional" killing at the guilt-innocence phase of trial. In <u>Thompson</u>, the court stated, "...[T]he Texas death penalty scheme requires the jury to find <u>at least one aggravating circumstance-a future threat to society</u>-that does not duplicate any finding made at the guilt phase. Hence, we need not reach the argument that the special issue about 'deliberateness' duplicates a guilt-phase issue." <u>Id. at 1059</u> (emphasis added). The court went on to discuss two other cases, <u>Collins v. Lockhart, 754 F.2d 258 (8th Cir. 1985)</u> and <u>Lowenfield v. Phelps, 817 F.2d 285 (5th Cir. 1987)</u> that involved duplication arguments. The <u>Thompson</u> court noted, "Thompson's case is readily distinguishable from both <u>Collins</u> and <u>Lowenfield</u> by the existence of an alternative narrowing issue at the penalty phase [future dangerousness]." <u>Id.</u>

at 1060.  These statements by the Thompson court indicate that a jury finding of the aggravating circumstance of future dangerousness suffices to satisfy the Eighth Amendment.  As such, the removal of "deliberateness" as a special issue has no adverse constitutional effect upon a capital defendant's Eighth Amendment rights because the amended article continues to require the finding of an aggravating factor, i.e., future dangerousness, as a safeguard against arbitrariness.

Though the "deliberateness" special issue has been removed, the imposition of the death penalty under the amended article is not arbitrary, erratic, wanton, or freakish.  The amended Texas capital sentencing scheme, by retaining the future dangerousness special issue, continues, much like the constitutionally-valid Kansas scheme in Marsh,

50

to rationally narrow the class of death-eligible defendants, as mandated by of the Eighth Amendment under Furman.

*ii. The Fourteenth Amendment Claim*

Sonnier also argues that the amended article violates the Fourteenth Amendment's Equal Protection Clause. According to Sonnier, the amended article treats those convicted of capital murder prior to September 1, 1991 differently than those convicted of capital murder after this date. He further asserts in conclusory fashion that, regardless of the level of review[15] we employ, "the change in the law violate[s] [his] Equal Protection Rights. . . ."

The Government, on the other hand, argues that this classification, differentiating between two

---

[15] As discussed in detail infra, the levels of review are strict scrutiny and rational basis scrutiny.

51

classes of defendants, is rational.  According to it, if Sonnier's argument prevails, the Legislature could never change a penal law or procedure.

The Equal Protection Clause demands that similarly situated persons be treated similarly under the law.  [Plyler v. Doe, 457 U.S. 202, 216 (1982)](#).  However, the Supreme Court has explained that:

> [t]he Fourteenth Amendment's promise that no person shall be denied the equal protection of the laws must coexist with the practical necessity that most legislation classifies for one purpose or another, with resulting disadvantage to various groups or persons.  We have attempted to reconcile the principle with the reality that by stating that, if a law neither burdens a fundamental right[16] nor

---

[16]  The Supreme court has explained that fundamental rights, for equal protection purposes, are such rights as: a right of a uniquely private nature, the right to vote, right of interstate travel and rights guaranteed by the First Amendment.  [Massachusetts Bd. of Retirement v. Murgia, 96 S.Ct.at 2566.](#)

targets a suspect class,[17] we will uphold the legislative classification so long as it bears a rational relation to some legitimate end.

Romer v. Evans, 116 S.Ct. at 1620, 1627 (year)(internal citations omitted). By contrast, if a classification does target a suspect class or impact a fundamental right, it will be strictly scrutinized and upheld only if it is precisely tailored to further a compelling government interest. Plyler v. Doe, 457 U.S. at 217-18.

The purpose of the Equal Protection Clause is to secure every person within the state's jurisdiction against intentional and arbitrary discrimination. Village of Willowbrook v. Olech, 120 S.Ct. 1073, 1075 (2000). "Even if a neutral

---

[17] A suspect class, as used in an equal protection analysis, is one saddled with such disabilities, or subjected to a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process. Massachusetts Bd. Of Retirement v. Murgia, 96 S.Ct. 2562, 2567 (1976). Examples of suspect classes are those based upon race, ancestry, or religion. Id.; Anderson v. Winter, 631 F.2d 1238, 1240 (5th Cir. 1980).

law has a disproportionately adverse impact. . ., it is unconstitutional under the Equal Protection Clause only if that impact can be traced to a discriminatory purpose." United States v. Galloway, 951 F.2d 64, 66 (5th Cir. 1992)(quoting Personnel Adm'r v. Feeney, 442 U.S. 256, 272 (1979)); see also United States v. Crew, 916 F.2d 980, 984 (5th Cir. 1990)("It is well established that showing of discriminatory intent or purpose is required to establish a valid equal protection claim."). Discriminatory purpose, in this context, implies that the decision maker selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects. Id.

As we begin our analysis, it is important for us to remember the warning of the United States Supreme Court: equal protection is not a license

for courts to judge the wisdom, fairness, or logic of legislative choices. F.C.C. v. Beach Communications, Inc., 113 S.Ct. 2096, 2101 (1993); see also Ferguson v. Skrupa, 372 U.S. 726, 729 (1963) ("Under the system of government created by our Constitution, it is up to the legislatures, not the courts, to decide on the wisdom and utility of legislation.").

The first inquiry for this court is whether the Texas legislature, in amending article 37.071, established a classification at all. We find that the omission of the deliberateness special issue results in a classification among convicted capital offenders, based upon the date of their underlying crime. Those defendants facing a death sentence prior to September 1, 1991, enjoyed the advantage that the state was required to prove an additional aggravating circumstance to show that

they were eligible for the death penalty; specifically, the jury was asked to consider, in deciding whether to impose the death penalty, whether the defendant acted deliberately. By contrast, those defendants facing a death sentence after September 1, 1991, did not enjoy jury consideration of the deliberateness special issue.

Our equal protection analysis cannot end here, however, because mere classification does not of itself deprive a group of equal protection of the law. Carrington v. Rash, 85 S.Ct. 775, 778. We must next determine whether Sonnier has carried his requisite burden of showing the existence of discriminatory purpose, which implies more than intent as volition or intent as awareness of consequences; it implies that the decision maker selected or reaffirmed a particular course of action at least in part because of, not merely in

56

spite of, its adverse effects. <u>United States v. Galloway</u>, 951 F.2d at 66.  We cannot find that Sonnier has carried this burden because nowhere has he even alleged an invidious purpose on the part of the Texas legislature in amending this article.

Furthermore, the Supreme Court has explained the widely-accepted rule that "the 14th Amendment does not forbid statutes and statutory changes to have a beginning, and thus to discriminate between the rights of an earlier and later time."  <u>Sperry & Hutchinson Co. V. Rhodes, 220 U.S. 502, 505 (1911)</u>.

## IV.  Conclusion

We cannot grant a COA to Sonnier.  Sonnier has failed to demonstrate that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could

57

conclude the issues presented are adequate to deserve encouragement to proceed further, as required by the United States Supreme Court's interpretation of 28 U.S.C. § 2253(c)(2) in Miller-El v. Cockrell.

In sum, we reject each of Sonnier's arguments. As to his ineffective assistance of counsel claims, we recognize that counsel's failure to conduct an in-depth investigation for mitigation evidence constitutes deficient performance under Strickland's requisite first prong. Nevertheless, we find that Sonnier did not carry his burden of showing that his attorneys' deficient performance prejudiced his death penalty defense under the second requirement of Strickland. As for his Simmons claim, following United States and Fifth Circuit precedent, we hold that Simmons is inapplicable to the Texas death penalty sentencing

scheme at issue in the instant case.  Finally, the Texas death penalty sentencing scheme does not violate either the Eighth or Fourteenth Amendment. It sufficiently narrows the death-eligible class and does not deny Sonnier equal protection the laws.

For these reasons, we deny Sonnier's request for a COA in its entirety.