# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
September 7, 2010

Lyle W. Cayce
Clerk

No. 08-70011

ROBERT SIMON, JR

Petitioner-Appellant

v.

CHRISTOPHER B EPPS, COMMISSIONER, MISSISSIPPI DEPARTMENT
OF CORRECTIONS

Respondent-Appellee

Appeal from the United States District Court
for the Northern District of Mississippi
USDC No. 2:04-cv-26

Before JOLLY, DENNIS, and PRADO, Circuit Judges.

PER CURIAM:[*]

Robert Simon, Jr. was convicted and sentenced to death for the murders
of Carl and Bobbie Joe Parker, and their son, Gregory Parker.[1]  After the
Mississippi courts denied relief on direct appeal and his post-conviction state
court remedies failed, Simon sought a writ of habeas corpus in the United States

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not
be published and is not precedent except under the limited circumstances set forth in 5TH CIR.
R. 47.5.4.

[1] Simon also murdered the Parkers' daughter, Charlotte, in the same incident.  He was
convicted and sentenced to life in prison for Charlotte's murder.

No. 08-70011

District Court for the Northern District of Mississippi.  The district court denied habeas relief and then denied his motion for a Certificate of Appealability ("COA") to this Court.  We granted a COA on the question of whether Simon's trial counsel was ineffective in failing to investigate his history of familial abuse and present that history as mitigation evidence at sentencing.  We asked the State and Simon for further briefing as to whether trial counsel was deficient, whether such deficient performance prejudiced Simon, and whether Simon's claims necessitated remand for an evidentiary hearing.

After reviewing the additional submissions from the parties, we affirm the denial of habeas relief.  We find remand for an evidentiary hearing unnecessary because, even accepting all allegations in the affidavits submitted by Simon as true, we cannot grant relief.  *See Clark v. Johnson*, 202 F.3d 760, 766 (5th Cir. 2000) (finding that an evidentiary hearing was unnecessary where the petitioner had not alleged any fact that, if proven true, would entitle him to relief, and thus the district court did not abuse its discretion in denying an evidentiary hearing).  Even though Simon has raised a factual dispute as to his counsel's deficient performance, the Mississippi Supreme Court reasonably found that Simon could not show that any deficient performance prejudiced him.  This is not a case where the "additional mitigating evidence [is] so compelling that there is a reasonable probability at least one juror could have reasonably determined that, because of [Simon's] reduced moral culpability, death was not an appropriate sentence." *Neal v. Puckett*, 286 F.3d 230, 241 (5th Cir. 2002) (per curiam) (en banc).  Therefore, we deny habeas relief.

No. 08-70011

## I. BACKGROUND

**A.    Factual and Procedural Background**

Carl and Bobbie Joe Parker lived in Marks, Mississippi, a small town in Quitman County, with their children, Charlotte, age nine, and Gregory, age twelve. On the evening of February 2, 1990, Simon and his accomplice, Anthony Carr, robbed and murdered the Parker family. Simon and Carr bound Carl, and beat Gregory before binding his hands and feet. They shot Carl and Gregory at point-blank range two times each in the back. They then cut off Carl's left ring finger in order to take his wedding ring. Carl and Gregory both bled to death on the floor. They shot Bobbie Joe in the chest and took her into a bedroom, which they then set on fire. Bobbie Joe died of the gunshot wound. Her body was so badly burned that it was not discovered until the next morning, and police had trouble identifying her remains. They also shot Charlotte three times, but she died of smoke inhalation.

The next day, Carl Parker's truck, filled with items from the Parker home, was found parked near the home of Simon's mother-in-law. Police also found a shotgun and two revolvers near the truck. Simon and Carr were arrested on the afternoon of February 3. Other valuables, including the Parkers' wedding rings, were found when police searched Simon's apartment in Memphis, Tennessee. Simon confessed while in custody.

The State first tried Simon for capital murder of only Charlotte Parker.[2] The jury found Simon guilty but could not reach a unanimous decision on his sentence, and the court sentenced Simon to life imprisonment. The State subsequently tried Carr for capital murder of all four Parkers, the jury convicted

---

[2] We refer to this case as *Simon I.*

3

No. 08-70011

Carr on all four counts, and sentenced him to death.

The State then tried Simon for the capital murders of Carl, Bobbie Joe, and Gregory Parker. A jury found Simon guilty on all three counts and returned a sentence of death on each count. The Supreme Court of Mississippi affirmed Simon's convictions and sentences on direct appeal. *See Simon v. State* (*Simon II)*, 688 So. 2d 791, 811 (Miss.), *cert. denied*, 521 U.S. 1126 (1997).

Simon filed a *pro se* petition for postconviction relief with the Mississippi Supreme Court, which the court denied. *Simon v. State* (*Simon III*), 857 So. 2d 668, 702 (Miss. 2003). Simon subsequently filed this habeas petition in the Northern District of Mississippi. The district court denied relief on all of Simon's claims. *See Simon v. Epps* (*Simon IV*), No. 2:04-cv-26, 2007 WL 4292498, at *47 (N.D. Miss. Nov. 30, 2007). The district court also denied Simon's motion for COA to this Court. *See Simon v. Epps (Simon V)*, No. 2:04-cv-26, 2008 WL 762182, at *8 (N.D. Miss. Mar. 19, 2008). We granted COA as to the question of whether Simon's trial counsel was ineffective in failing to investigate his history of familial abuse, and present that history as mitigation evidence as sentencing. *Simon v. Epps* (*Simon VI*), 344 F. App'x 69, 85–86 (5th Cir. 2009) (per curiam) (unpublished).

**B.    Sentencing Evidence**

We now recount the evidence that was actually presented at Simon's sentencing, and the evidence that Simon argues his trial counsel should have uncovered and presented to the jury at sentencing.

**1.    Sentencing Phase of Trial**

**a.    State Witnesses**

To establish aggravating circumstances, the State called several witnesses

No. 08-70011

during the sentencing phase of Simon's trial. The State relied on four aggravating factors for each of the victims. For all three, the State asked the jury find the murders were: committed for the purpose of avoiding arrest, committed for pecuniary gain, and especially heinous, atrocious, and cruel. With respect to Carl, the State asked the jury to find the murder was committed while Simon or his accomplice were engaged in the commission of a robbery. For Bobbie Joe, the State asked the jury to find the murder was committed while Simon or his accomplice were engaged in the crime of burglary of a dwelling. Finally, for Gregory, the State asked the jury to find the crime was committed while Simon or his accomplice were engaged in the crime of kidnapping.

The State called Scott Parker, Carl's grown son, who testified about his family and authenticated photographs of the Parkers taken while they were alive. The State then called a crime scene investigator who authenticated gruesome pictures that he had taken of the crime scene. The medical examiner authenticated and described photographs of the bodies of Carl, Bobbie Joe, and Gregory taken at the morgue. As part of his testimony, the medical examiner testified that Gregory and Carl suffered pain before they died. He also testified that Carl, Bobbie Joe, and Gregory died of gunshot wounds, not smoke inhalation. The remains of Bobbie Joe were so badly charred that the examiner was only able to identify a few of her organs. The State's final witness, Sheriff Jack Harrison, authenticated additional photographs taken of Carl and Gregory's bodies.

### b.    Defense Witnesses

Trial counsel for Simon attempted to convince the jury that Simon had a non-violent personality but was overcome by violence when he murdered the

5

Parkers.  Trial counsel called three witnesses during sentencing.  Dr. William Kallman, a psychologist, appointed by the court at the defense's request, testified as to Simon's family history and personality type.  Trial counsel originally obtained Dr. Kallman's authorization as an expert fourteen days before the *Simon I* trial.  He visited with Simon for six or seven hours on one occasion, and one and a half to three hours on another.  He testified in the *Simon I* trial, and again in *Simon II*, but apparently did not undertake any additional preparation after the first trial.

Dr. Kallman apparently had only brief contact with Simon's family members, and did not ask the family members about Simon's childhood, background, or family history.  Dr. Kallman testified that Simon had a normal rural background as the oldest of four children.  He testified that since childhood, Simon was a loner, and he quit school in the eleventh grade, but subsequently obtained a GED.  Dr. Kallman testified that Simon entered the military but never quite fit in, and then served as a guard at Parchman Farm, the Mississippi State Penitentiary. Dr. Kallman explained that the whole Simon family had a distrustful attitude toward people and were somewhat isolated. Dr. Kallman described Simon's love of animals, and said that on three separate occasions, kids in pickup trucks drove by his house and shot his dogs.  Simon apparently did not believe he could do anything about the attacks on his dogs, and Dr. Kallman opined that these incidents contributed to his sense of powerlessness and not fitting in.

Dr. Kallman testified that from a series of tests, he concluded that Simon was not comfortable around people, was unable to deal with problems or better his life, and that he was a very thoughtful, introverted, and angry person.  He

concluded that the tests did not show Simon to be an inherently violent person. Dr. Kallman also believed that if Simon committed a violent crime he would show remorse. On re-direct, Dr. Kallman described Simon as a person who may build up a lot of anger inside and explode at times but does not have an angry personality.

Antoinette Thomas, a friend who met Simon a year and a half before the murders, testified that Simon treated people nicely, and showed a lot of affection toward his young daughter. On cross-examination, counsel for the State asked whether, in her opinion of Simon, she took into account that he had been convicted of the capital murder of a child (Charlotte Parker). She answered that he had not committed the crime, and that no one is looking for the truth. The court admonished the jury to disregard her statement.

Rosie Lee Simon, Simon's mother, testified that Simon never gave her any problems and was a loner. As her oldest child, she testified that Simon helped her raise the other kids. She testified that he had not exhibited any violent tendencies and that she would not expect him to commit capital murder.

### c.    Closing Arguments

On closing, counsel for the State described how the State had established the aggravating factors. Counsel also referenced the Bible, stating that "[w]hoever shed man's blood by man shall his blood be shed." *Genesis* 9:6. Counsel then asked the jury for justice. In his final remarks, counsel for the State emphasized the horrors inflicted upon the Parkers and again asked that the jury do justice.

Simon's counsel also discussed that God actually banished Cain for killing his brother, rather than killing him as *Genesis* 9:6 suggests. Counsel continued

that he believed the jury mistakenly convicted Simon for the three capital murders, but that he had to accept the jury verdict at this stage. He later described a case in which two men who had been put to death turned out to be innocent. He then made a plea against the death penalty in general, but admitted that despite his opposition to the death penalty, the law put the power to kill Simon in the jury's hands. He argued that the State was not really looking for justice, but only for revenge.

The jury returned three death sentences. The jury found unanimously that the State proved all four aggravating factors as to each of the victims beyond a reasonable doubt and that the mitigating factors did not outweigh the aggravating factors.

### 2.    Affidavits

Simon attached affidavits from his half-brother Jerry Games, his younger brother Aaron Simon, his mother Rosie Lee Simon, and a psychologist[3] to both his petition for post-conviction relief to the Mississippi Supreme Court and his federal habeas petition. The affidavits establish that Simon's father, Robert Simon, Sr. ("Simon Sr."), was a very large, physically abusive man, who was uncommunicative to his children.[4]

Games is Simon's half-brother through their mother, Rosie Lee, and is three years older than Simon. Games came to live with Simon and his family

---

[3] The affidavit of the psychologist, Dr. Alford, is not relevant to our disposition. Dr. Alford's affidavit describes the deficiencies of Dr. Kallman's psychological evaluation. However, our review on COA is only of Simon's trial counsel's performance, not Dr. Kallman's.

[4] The affidavits also relate to Simon's claim of ineffective assistance of counsel for failing to corroborate his claim that his confession was coerced. However, we denied COA on that claim, *Simon VI*, 344 F. App'x at 79, and thus do not consider those portions of the affidavits.

No. 08-70011

when Games was about thirteen years old. Games avers that he spoke to trial counsel and his staff, but that they asked him only very general questions about Simon, and did not inquire about his childhood. In his affidavit, Games states that Simon Sr. used to beat Games, Simon, and Aaron with a whip fashioned from a farm-equipment fan-belt. The whip was the length of Simon Sr.'s forearm. Games testifies that Games bore the brunt of Simon Sr.'s beatings because he wet the bed, and for reading out loud. Games asserts that those beatings made Simon very upset because of how close he felt to Games.

Games also claims that Simon Sr.'s beatings began to focus more on Simon when Simon reached sixth grade. Games believed that Simon Sr. was concerned Games would tell the neighbors about the beatings. Around this time, Games stole a gun from Simon Sr. to protect himself, Simon, and Aaron from the beatings. Before he could use the gun, though, he told Rosie Lee about his plans and she sent him to live with an uncle in Chicago. Games also states that while he lived with the Simon family, he and Simon began stealing small items from the store near their house, and that after he left, Simon went on to steal larger and larger things. Games also claims that Simon is a loner like his father, and would go into the woods and stay there for days at a time by himself.

Aaron's affidavit stated that Simon Sr. would whip the boys with the "cotton-picker belt," and that the whipping would leave marks, bruises, and welts and would cause bleeding. Aaron does not testify to the frequency of the whippings, only that they were "bad," and that he saw when Games and Simon received their whippings.

Rosie Lee's affidavit states that Simon Sr. beat Games for wetting the bed, and that Simon witnessed those beatings. She swears that Simon Sr. also beat

Simon. She also testifies that Simon Sr. is a "funny-type person" who keeps to himself, and that days sometimes pass without him speaking to her.

## II. STANDARD OF REVIEW

"[T]his court reviews the district court's findings of fact for clear error and its conclusions of law de novo, applying the same standards to the state court's decision as did the district court." *Harrison v. Quarterman*, 496 F.3d 419, 423 (5th Cir. 2007) (citing *Coble v. Dretke*, 444 F.3d 345, 349 (5th Cir. 2006)). To obtain habeas relief under 28 U.S.C. § 2254, Simon must show that the Supreme Court of Mississippi's resolution of his claims was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court. 28 U.S.C. § 2254(d)(1).

A decision is contrary to clearly established federal law if it "relies on legal rules that directly conflict with prior holdings of the Supreme Court or if it reaches a different conclusion than the Supreme Court on materially indistinguishable facts." *Harrison*, 496 F.3d at 424 (citation and internal quotation marks omitted). A decision is an unreasonable application of clearly established federal law if it is "objectively unreasonable." *Pondexter v. Dretke*, 346 F.3d 142, 146 (5th Cir. 2003).

The Mississippi Supreme Court found that Simon's counsel's performance was not constitutionally deficient, and that, even if his failure to discover potentially mitigating evidence was constitutionally deficient, such failure did not prejudice Simon. *Simon III*, 857 So. 2d at 685. Thus, in order to obtain habeas relief, Simon must show that both of those rulings were contrary to, or involved an unreasonable application of, clearly established federal law. In determining whether the state court applied clearly established federal law

10

No. 08-70011

unreasonably, we look to whether the decision itself is objectively reasonable. *Neal*, 286 F.3d at 246. In other words, we focus on the Mississippi Supreme Court's ultimate determination, not the reasoning that it used to get there.

## III. ANALYSIS

"The Sixth Amendment requires defense counsel to conduct a reasonably thorough pretrial inquiry into the defenses that might be offered in mitigation of punishment." *Neal*, 286 F.3d at 235. To establish constitutionally deficient performance, Simon must show that (1) his trial counsel's performance was deficient, and (2) this deficient performance prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Trial counsel's performance is judged against "an objective standard of reasonableness." *Id.* at 688. Our review of counsel's performance is "highly deferential." *Id.* at 689. Counsel's "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Id.* at 690. The prejudice prong requires Simon to show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. If Simon cannot satisfy one of *Strickland*'s prongs, there is no need to assess the other. *Id.* at 697.

### A.    Deficient Performance

Trial "counsel have a duty to make reasonable investigations or to make a reasonable decision that makes investigations unnecessary." *Id.* at 691. "In assessing counsel's investigation, we must conduct an objective review of their performance, measured for reasonableness under prevailing professional norms, which includes a context-dependent consideration of the challenged conduct as seen from counsel's perspective at the time." *Wiggins v. Smith*, 539 U.S. 510,

No. 08-70011

523 (2003) (internal quotation marks and citations omitted). "In assessing counsel's performance in this context, we look to how counsel prepared for sentencing, what mitigating evidence counsel accumulated, what additional leads counsel had, and what results counsel could have reasonably expected from those leads." *Blanton v. Quarterman*, 543 F.3d 230, 236 (5th Cir. 2008) (citing *Neal*, 286 F.3d at 237).

We must consider "not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins*, 539 U.S. at 527. Relying on the American Bar Association's *Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases* (the "ABA Guidelines"), the Supreme Court has held that "investigation into mitigating evidence should comprise efforts to discover *all reasonably available* mitigating evidence." *Id.* at 524. However, "there comes a point at which evidence from more distant relatives can reasonably be expected to be only cumulative, and the search for it distractive from more important duties." *Bobby v. Van Hook*, 130 S. Ct. 13, 19 (2009). "[C]ounsel has a duty to make reasonable investigations *or* to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691 (emphasis added). With this in mind, we consider whether, accepting the facts as alleged by Simon, trial counsel's failure to uncover Simon Sr.'s abuse rendered counsel's performance deficient

As we noted above, because we resolve this matter without allowing Simon an evidentiary hearing, we accept the affidavits as true. According to Games' affidavit, counsel only very briefly spoke with him regarding Simon, and did not ask about Simon's personal background. Simon's brother, Aaron, avers that trial

12

No. 08-70011

counsel never contacted him,[5] but that if trial counsel had, he would have testified as to the abuse he, Simon, and Games suffered when they were younger. Rosie Lee did not testify about childhood abuse at sentencing, and her affidavit contains no information about what trial counsel actually asked her in preparing her for her testimony before she took the stand.

Rosie Lee testified at the sentencing phase of Simon's trial that Simon was never violent throughout his childhood. Trial counsel also called Dr. Kallman to the stand to testify about Simon's personality, and as part of that testimony, he testified as to portions of Simon's background, but Dr. Kallman's testimony was based upon tests given to Simon himself, and Dr. Kallman did not mention any abuse in Simon's past.

The Supreme Court of Mississippi ruled that Simon's counsel was not constitutionally deficient because Simon had not shown that "his counsel knew or had reason to know of his past abuse given his and Dr. Kallman's investigation." *Simon III*, 857 So. 2d at 685. However the court seemed to base that finding at least in part on the fact that "trial counsel was [n]ever told before or during the sentencing phase of trial that Simon was abused as a child." *Id*. In light of *Wiggins*, reliance upon the mere fact that Simon's counsel was not told of Simon's abuse is an incorrect application of Supreme Court precedent. However, as stated above, we review the state court's ultimate decision that trial counsel's performance was not deficient, not whether its reasoning was correct. *See Neal*, 286 F.3d at 246. Therefore, we turn to application of the caselaw to determine whether Simon's counsel was constitutionally deficient.

---

[5] For purposes of this opinion, we assume this is true. However, we note, as the State points out, that trial counsel listed Aaron as a potential witness at sentencing, and counsel likely would have talked to him at some point if that were true.

No. 08-70011

Simon argues that this case is like our decision in *Neal*, in which we held that trial counsel's performance was constitutionally deficient because he did not adequately present evidence that Neal was mentally retarded and had been badly mistreated. *See Neal*, 286 F.3d at 247. In *Neal*, trial counsel presented an "outline" of evidence at sentencing that Neal was mentally retarded, but we found that readily available materials could have augmented Neal's mitigation case at sentencing, and that Neal's counsel was deficient by failing to investigate, gather, and consider the materials. *Id.* at 240. Simon contends that in *Neal*, counsel did even more than in this case, because there, trial counsel at least presented an outline, whereas here, Simon's counsel did not present any evidence of childhood abuse at all.

The Supreme Court has considered the reasonableness of specific investigations by counsel in death penalty cases. In *Rompilla v. Beard*, the Supreme Court held that trial counsel's failure at sentencing to examine a file relating to the defendant's prior conviction for rape and assault despite knowing that the state would use the prior convictions against the defendant fell below the level of reasonable performance. 545 U.S. 374, 383 (2005). In *Wiggins*, the Supreme Court held that trial counsel's failure to uncover evidence of repeated molestations and rapes of the defendant as a child was not a reasonable investigation. 539 U.S. at 527–29.

Although counsel interviewed Games, Rosie Lee, and Thomas, he appears not to have talked to them "at the length or in the depth required for these purposes." *Sonnier v. Quarterman*, 476 F.3d 349, 358 (5th Cir. 2007). On this record, it is not clear what Simon's trial counsel asked Rosie Lee, but certainly counsel's duties extended beyond talking to Simon's mother. Simon himself

14

never told his counsel about the abuse he suffered at the hands of his father, but this failure does not excuse his counsel's duty to uncover evidence. *See Rompilla*, 545 U.S. at 381, 383 (finding deficient performance even where the defendant actively interfered with counsel's mitigating evidence investigation). Nothing suggested to trial counsel that Simon had been abused, but we look not only to the evidence known to trial counsel, but what evidence a reasonable investigation would uncover. *See Wiggins*, 539 U.S. at 527 (directing habeas courts to consider "whether the known evidence would lead a reasonable attorney to investigate further").

Although "[a] decision not to investigate" may be reasonable if "'reasonable professional judgments support the limitations,'" *id.* at 533 (quoting *Strickland*, 466 U.S. at 691), Simon's counsel does not appear to have made such a professional judgment. Investigation of Simon's background and childhood would have been relevant to the theory which counsel chose to argue to the jury—that Simon had a non-violent personality overcome with violence on this one occasion. Thus, it is clear that counsel did not make a strategic decision to pursue another line of mitigation to the exclusion of investigating Simon's background.[6]

A reasonable investigation into potential mitigating evidence includes more than simply talking to Simon, his mother, and people who knew Simon and

---

[6] Trial counsel put on a substantially similar mitigation case at Charlotte's trial, which resulted in a life sentence. Although trial counsel may have felt investigation into mitigation evidence was unnecessary after the first trial resulted in a life sentence, we look only to trial counsel's actions in putting on mitigation evidence in this case.

15

No. 08-70011

his wife.[7]  Given the availability of Games and Aaron to testify to the abuse Simon suffered, we believe that a reasonable investigation would have uncovered evidence of childhood abuse.  Therefore, if we resolve any factual dispute in Simon's favor, we would find his trial counsel's performance constitutionally deficient.  However, there has never been an evidentiary hearing in this case, therefore remand would be necessary to further develop the record and give Simon the chance to show that his counsel was constitutionally deficient.  But we need not remand for an evidentiary hearing because we find that even if Simon established deficient performance, he cannot show that the performance prejudiced him.

**B.    Prejudice**

"In reviewing the issue of prejudice at capital sentencing we weigh the quality and quantity of the available mitigating evidence." *Blanton*, 543 F.3d at 236 (citing *Williams v. Taylor*, 529 U.S. 362, 397–98 (2000)).  "We then ask whether the changes to the mitigation case would have a reasonable probability of causing a juror to change his or her mind about imposing the death penalty." *Id.* (citations omitted).  "In assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence." *Wiggins*, 539 U.S. at 534.  Because the Mississippi Supreme Court held that even if trial counsel's performance was deficient, it did not prejudice Simon, *Simon III*, 857 So. 2d at 685, we must ask whether the state court's conclusion is objectively

---

[7] To the extent that trial counsel relied upon an independent investigation by Dr. Kallman, such reliance is unreasonable considering the record shows Dr. Kallman spoke only with Simon himself and did no independent investigation.  *See Wiggins*, 539 U.S. at 523 (recounting that counsel arranged for a psychologist to perform tests on the defendant, but that the reports did not reveal anything about the defendant's background).

unreasonable.  *See Neal*, 386 F.3d at 246.

Simon claims his trial counsel should have uncovered and presented evidence that his father beat him with a whip fashioned from farm equipment and that he watched his father beat his brothers.  Instead of this mitigation evidence, trial counsel presented an argument that Simon was a non-violent person overcome by violence, and supported this theory with the testimony of Dr. Kallman, Thomas, and Rosie Lee.  They described his generally non-violent personality, including his interaction with his daughter, and presented some limited information about his background.  Thomas told the jury that she did not believe Simon actually committed the crime.  Dr. Kallman testified about cruel kids who had shot his dogs in the past, which contributed to his feelings of helplessness.  Trial counsel's closing arguments were essentially a general plea for mercy.

In contrast to the mitigation evidence, the State presented evidence of aggravating factors justifying imposition of the death penalty.  The State proved four aggravating factors as to each of the three victims:  the jury found that all three murders were committed for pecuniary gain, were committed for the purpose of avoiding arrest, and were especially heinous, atrocious and cruel. The jury also found that Carl's murder was committed while Simon or his accomplice was engaged in the commission of a robbery, that Bobbie Joe's murder was committed while Simon or his accomplice was engaged in burgling a dwelling, and that Gregory's murder was committed while Simon or his accomplice was engaged in kidnapping.  With respect to the heinous, atrocious, and cruel nature of the murders, the jury heard testimony from Carl's son about the Parker family as well as gruesome photographs of their bodies.

In *Wiggins*, counsel failed to uncover and present evidence that the defendant suffered severe abuse until the age of six years old at the hands of an alcoholic, absentee mother, and "physical torment, sexual molestation and repeated rape during his subsequent years in foster care." 539 U.S. at 535. The abuse Simon suffered was less extensive than in *Wiggins* and would not have lessened Simon's moral culpability as much as the evidence would have in *Wiggins*. Furthermore, because the state court never reached the *Strickland* prejudice prong, the Supreme Court in *Wiggins* did not have to defer to a reasonable interpretation of precedent. *Id*. at 534. Here, we must defer to the Mississippi Supreme Court's holding if reasonable.

In *Williams*, the Supreme Court also found that trial counsel's deficiency prejudiced the defendant when he failed to uncover mitigation evidence that graphically described the defendant's "nightmarish childhood." 529 U.S. at 395. Significant records were available establishing the mitigation evidence relating to Williams's childhood, including the imprisonment of Williams' parents for criminal neglect, his commitment to the custody of social services, and records that he was borderline retarded and failed to advance past the sixth grade. *Id*. at 395–96. Also, the evidence in *Williams* would have been more tangible and likely more powerful to a jury. There is no documentary evidence of Simon's abuse, so the jury could only accept Games' and Aaron's testimony as true, and the abuse he suffered does not rise to the type of abuse described in *Williams*.

*Rompilla* also involved multiple facts distinguishing it from the instant case. Rompilla was physically and verbally abused by his father, who put him in a pen filled with dog excrement; his parents were severe alcoholics; his parents often fought violently; the general living conditions of his home were

18

No. 08-70011

despicable; and Rompilla was mentally retarded. 545 U.S. at 390–92. The Supreme Court found that trial counsel's failure to review a file that documented this evidence prejudiced Rompilla because it might have influenced the appraisal of Rompilla's culpability. *Id.* at 393. As with *Wiggins* and *Williams*, the mitigating facts relating to the defendant's childhood in *Rompilla* are far more extensive and persuasive than in the instant case. Furthermore, the Supreme Court reviewed the prejudice prong in *Rompilla de novo*, because the Pennsylvania Supreme Court never ruled on *Strickland*'s prejudice prong. *Id.* at 390. Therefore, *Rompilla* is readily distinguishable from this case.

This case is more similar to *Woodford v. Visciotti*, in which the Supreme Court held that, despite trial counsel's deficiency in failing to uncover mitigating evidence, the California Supreme Court reasonably determined that such failure did not prejudice him. 537 U.S. 19, 26–27 (2002). The California Supreme Court determined that despite not presenting substantial evidence of the defendant's "troubled family background," that "the circumstances of the crime . . . coupled with the aggravating evidence of prior offenses . . . was devastating." *Id.* at 26. The Supreme Court ruled that it must defer to the state court's determination unless it was objectively unreasonable. *Id.* at 27. Similarly, even if we would reach a different conclusion here, we must deny habeas if the Mississippi Supreme Court's decision was reasonable.

In light of the overwhelming aggravating factors and nature of the crimes, as well as the differences in degree of abuse in cases in which the Supreme Court has found prejudice, we hold that the Mississippi Supreme Court reasonably determined that the failure of Simon's trial counsel to uncover evidence of Simon's childhood abuse was not prejudicial. The three affidavits establish that

19

Simon was beaten by his father with a fan-belt when he was a child. Certainly it appears that trial counsel could have put on a more persuasive mitigation case if he had focused on the facts alleged in these affidavits.

However, the most descriptive of the affidavits, the Games affidavit, also includes statements that Simon used to steal from stores and that the theft got worse and worse over the years. If discovered, counsel could have reasonably not called Games as a witness due to the danger of Games testifying to damaging information on cross-examination. Furthermore, although trial counsel could have determined that he should present the information about abuse to the jury, he would have been reasonable to push forward with the non-violent personality theory. Trial counsel might have made a reasonable professional judgment that the history of abuse undermines the theory that Simon has a non-violent personality and was overcome by violence. Therefore, it is not clear that, even if counsel had performed a reasonable investigation of Simon's childhood, that evidence of abuse would have been presented at sentencing.

Also, even if trial counsel had presented the additional evidence, the Mississippi Supreme Court was reasonable to hold that there was no reasonable "probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695. We need not determine whether, reweighing the aggravating evidence described above against evidence of Simon's childhood abuse, "there is a reasonable probability that [the evidence of abuse's] introduction would have caused the jury to decline to impose the death penalty," *Sonnier*, 476 F.3d at 360, only that it is reasonable for another court

to so conclude. *See Neal* 286 F.3d at 247 (holding the Mississippi Supreme Court's determination that the outcome would have been the same because of the extreme cruelty of the murder was reasonable). The jury found twelve separate aggravating factors, any one of which could justify a death sentence, and the heinous nature of these crimes makes it apparent that the Mississippi Supreme Court was reasonable in its determination.

Simon argues that the failure of the jury to impose the death penalty in *Simon I* indicates a reasonable probability that effective trial counsel would have persuaded at least one juror to vote differently. In a procedurally similar case, the Seventh Circuit found that, where trial counsel failed to investigate and call a crucial witness, and a co-defendant whose counsel called the crucial witness obtained a hung jury, "there [wa]s a reasonable probability that the outcome" would have been different absent trial counsel's deficiency. *Adams v. Bertrand*, 453 F.3d 428, 437–38 (7th Cir. 2006). The court found that "the outcome of [the co-defendant's] trial, together with [the witness's] testimony and the relatively thin evidence presented at Adams's trial, does undermine our confidence in the outcome." *Id.* at 438. The *Adams* court made an independent determination of whether counsel's deficient performance prejudiced Adams, because the state court never ruled on prejudice, having found that Adams' counsel's performance was reasonable. *Id.* at 437, 437 n.6.

Although at first glance, *Adams* appears similar, there are many factual differences. In *Simon I*, the jury made its decision on the basis of only one victim and this case involves three victims. One victim was involved in the trial of both Adams and his co-defendant. Also, the *Adams* court emphasized the thin evidence of Adams' guilt when compared to the testimony counsel should have

uncovered—a witness whose account of the crime completely contradicted the victim's account. *Id.* Here, as discussed above, the State's case in support of the death penalty was very strong, and the evidence of Simon's childhood abuse does not reach the level that the Supreme Court has found would have swayed a jury. *See Rompilla*, 545 U.S. at 390–92; *Wiggins*, 539 U.S. at 535; *Williams*, 529 U.S. at 395. Finally, and perhaps most importantly, we must defer to the Mississippi Supreme Court's reasonable decision, whereas the *Adams* court made an independent prejudice determination.[8]

The *Simon I* jury may have failed to come to a decision "for any number of reasons, including the idiosyncratic views of a single juror." *United States v. Newton*, 369 F.3d 659, 680 (2d Cir. 2004). Although the result in the *Simon I* case potentially supports finding prejudice,[9] "it does not compel such a conclusion." *Newton*, 369 F.3d at 680. In light of the circumstances, we cannot

---

[8] In an unpublished decision, the Sixth Circuit found similarly to the Seventh Circuit, stating "[a]s the two prior hung juries indicate, the case before the jury was extremely close. We therefore find that Byrd was prejudiced by counsel's deficient performance . . . ." *Byrd v. Trombley*, 352 F. App'x 6, 13 (6th Cir. 2009) (unpublished). *Byrd* is distinguishable for the same reasons as *Adams*. The court found that Byrd's counsel was deficient for introducing into evidence Byrd's prior forgery conviction. *Id.* at 11–12. Byrd's testimony was the only evidence presented at trial that he did not commit the crime for which he was convicted, so that his credibility was central to the jury's determination. *Id.* The court did not defer to the reasonableness of the state court's determination on prejudice, because the state court had not reached that issue. *Id.*; *see People v. Byrd*, No. 245623, 2004 WL 1801036, at *4 (Mich. Ct. App. Aug. 12, 2004) (declining to reach the prejudice prong because it found that Byrd's counsel was not constitutionally deficient).

[9] *Cf. United States v. Beckman*, 222 F.3d 512, 526 (8th Cir. 2000) ("In light of . . . the first trial in which a hung jury resulted, we cannot say that the error was harmless beyond a reasonable doubt."); *United States v. Paguio*, 114 F.3d 928, 935 (9th Cir. 1997) ("We cannot characterize the error as harmless, because the hung jury at the first trial persuades us that the case was close and might have turned on this evidence."). We note that *Newton*, *Beckman*, and *Paguio* were direct criminal appeals, and thus the courts were not as restricted in their review of the district courts as we are in our review of the Mississippi Supreme Court.

No. 08-70011

say that the Mississippi Supreme Court was unreasonable in holding that, even if trial counsel's performance was constitutionally deficient, there is no reasonable probability that a juror would have voted against the death penalty. Therefore, Simon cannot establish prejudice.

## IV. CONCLUSION

Because Simon cannot demonstrate that the Mississippi Supreme Court unreasonably determined that any deficient performance by his trial counsel prejudiced him, we DENY his petition for a writ of habeas corpus, and, accordingly, the judgment of the district court is

AFFIRMED.

No. 08-70011

E. GRADY JOLLY, dissenting in part:

Because Simon cannot satisfy the prejudice prong of Strickland, it is not necessary to assess whether his counsel's performance was deficient and, consequently, the discussion of deficient performance in Part III A of the opinion is dicta. For this reason, I do not join part III A of the opinion. I fully concur in the remainder of the opinion.