# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

March 1, 2012

No. 11-70015

Lyle W. Cayce
Clerk

ROBERT SIMON, JR.,

Petitioner–Appellant

v.

CHRISTOPHER B EPPS, COMMISSIONER, MISSISSIPPI DEPARTMENT
OF CORRECTIONS,

Respondent–Appellee

Appeal from the United States District Court
for the Northern District of Mississippi
USDC No. 2:11-CV-111

Before JOLLY, DENNIS, and PRADO, Circuit Judges.

PER CURIAM:[*]

Robert Simon ,Jr., was convicted and sentenced to death for the murders
of Carl and Bobbie Joe Parker and their son Gregory Parker.[1] On May 13, 2011,
Simon filed a petition for a writ of habeas corpus in the United States District
Court for the Northern District of Mississippi, claiming that he is incompetent

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not
be published and is not precedent except under the limited circumstances set forth in 5TH CIR.
R. 47.5.4.

[1] Simon was separately tried for the murder of the Parkers' daughter, Charlotte, for
which he was convicted and sentenced to life in prison.

No. 11-70015

to be executed and that the Mississippi Supreme Court, in rejecting his claim of incompetency, contravened the Supreme Court's decisions in *Ford v. Wainwright*, 477 U.S. 399 (1986), and *Panetti v. Quarterman*, 551 U.S. 930 (2007). The district court denied the petition, but granted Simon a Certificate of Appealability ("COA") on two issues, *Simon v. Epps*, No. 2:11-CV-111, 2011 WL 1988388 (N.D. Miss. May 20, 2011), and Simon appealed. This court granted a stay of his execution, which had been scheduled for May 24, 2011, in order to consider his appeal.

For the reasons stated below, we reverse the district court's denial of Simon's habeas petition, and we remand the case to the district court for further proceedings consistent with this opinion.

## I. BACKGROUND

Simon's petition claims that he is incompetent to be executed as a result of a head injury suffered on January 7, 2011. His medical records, which were disclosed to both Simon and the State by court order, document the treatment that Simon received for this injury. One page of the records, titled "Emergency Report: Man Down," reflects that Simon was initially admitted to the prison hospital around 5:45 a.m. on January 7, 2011. Simon's chief complaints were that he was confused, did not remember what had happened to him, and had a severe headache. The report describes Simon as "awake and alert, but non verbal to staff, with bruises spiraaled [sic] on his face from right frontal down to left facial." The report does not disclose the cause of this injury, but a related progress note states that Simon "[c]laimed he slipped and fell and sustained superficial scratches on the forehead and rt. face." The report also indicates that Simon expressed an inability to understand English during his examination. Simon was discharged from the hospital around 8:11 a.m. that same day with a diagnosis of hypertension.

No. 11-70015

Simon's records contain a second report titled "Emergency Report: Man Down," which states that Simon was readmitted to the hospital around 11:00 a.m. after being discovered unconscious. His admitting diagnosis was "confusions." The report indicates that Simon exhibited "[a]ltered neurological function" and states that a goal for his treatment was attaining "[m]aximum neurologic function." Another goal listed was altering Simon's "mental status" by "reorient[ing him] to time and place." At 11:25 a.m., a nurse noted that Simon was speaking in "word salad." After this second admission to the hospital, Simon was kept in the hospital for several days.

At around 1:10 a.m. on January 8, 2011, a nurse noted that Simon was "disoriented," asking questions such as, "What?" "Where am I?" and, "What happened?" At around 6:00 a.m. on January 9, Simon refused to take his medications, stating, "These aren't mine" and again asking, "Where am I?" Simon appears to have been discharged some time on January 11, 2011. The medical records indicate that his condition with respect to his chief complaint of confusion was "[i]mproved" upon discharge.

On February 24, 2011, a psychiatry consult was requested for Simon because he had exhibited "[a]bnormal behavior" for about two months. Specifically, the request noted that Simon "talk[s] unusual[ly] and when asking questions He repeat[s] the same words and Very unusual behavior since 2 months ago." On March 1, 2011, Kim Nagel, M.D., "evaluated [Simon] at the request of Dr. Kim who has noticed a change in his behavior in the last 2 months." Following the evaluation, Dr. Nagel wrote:

> The inmate has made a change in his communication pattern in the last couple months. He has done things such as substitute the word "me" in place of "I" when he refers to himself. When I asked him about this, he said "they mean the same thing don't they." In effect he is talking baby talk. He realizes this and it appears that staff like the case manager Ms. Craft, who sees him fairly often, see this as a coping mechanism to deal with prison. He referred to one of his

3

friends in a neighboring cell helping him out and he likes this. He was in the hospital for several days at the beginning of this change. He did not like the isolation of the hospital and said that there was nothing wrong with him. At present he seems to be totally in control of this desire to change his method of communication and he has no complaints about his current status in general. I will continue to check on him on occasion, and especially make sure that Ms. Craft, who has known him for years, is comfortable with his functioning. His [sic] is oriented and able to care for himself adequately at present. I do not see any current need for further intervention.

Shortly after this visit, on March 16, 2011, Simon's attorneys, T.H. Freeland IV and Forrest Jenkins, visited him. Freeland later stated by affidavit that he had been contacted prior to the March 16 visit by another prisoner in Simon's unit, who told him that Simon had suffered a head injury and that "something was seriously wrong with him." Freeland stated in his affidavit that when he arrived at the prison on March 16, "it was very clear that [Simon] did not recognize" him. Freeland found this "very surprising," because during the more than ten years that Freeland had been representing Simon, Simon "was both very aware of who [Freeland] was and viewed meetings with [him] as very important." Freeland attempted to discuss Simon's injury with him, but Simon told him that he did not know what had happened. Freeland also stated that Simon did not know the names of his family members, did not appear to understand the nature of the proceedings against him, and did not appear capable of communicating information to Freeland about his case. Jenkins also gave an affidavit about this meeting which accords with the account given by Freeland. Jenkins stated that when the attorneys told Simon that his execution date may be set in the near future, Simon responded, "Me?" Jenkins also stated that Simon asked Freeland several times, "You sure you're my lawyer?" and also asked a guard if Freeland was really his lawyer.

No. 11-70015

On March 21, 2011, the United States Supreme Court denied Simon's petition for a writ of certiorari, *Simon v. Epps*, 131 S. Ct. 1677 (2011) (mem.), and the Attorney General moved to set an execution date. That same day, Barry Beaven, M.D., met with Simon "[i]n [order] to evaluate [his] memory and confusion since a previous fall at request of Mr. Sparkman," the prison superintendent. Dr. Beaven noted that Simon "[a]lways has a headache." Describing Simon, Dr. Beaven wrote: "Doesn't know president, home phone, day/year, age, birthday. Doesn't know mothers name. Can't spell world backwards. Doesn't remember ball, flag, tree. Says me want this—3rd person speech." Finally, Dr. Beaven stated that Simon "asked about his TV and was told that it hadn't come in yet. He knew that his closthes [sic] size was too small. He does have apparent memory about things he wanted. Direct questioning made all responses invalid."

On March 29, 2011, defense counsel responded to the motion to set an execution date, arguing that Simon was incompetent to be executed. On March 31, 2011, the State moved to access Simon's medical records. Defense counsel filed a petition for post-conviction relief in state court based on Simon's incompetence and moved the court for appointment of counsel and for expert assistance. On April 7, 2011, the Mississippi Supreme Court ordered that Simon's medical records be made available to both parties, and held Simon's other motions in abeyance. Because it is the policy of the Mississippi Department of Corrections ("MDOC") to require a court order before allowing outside medical personnel to meet with inmates, the court's decision to hold Simon's motions in abeyance effectively prevented Simon from being evaluated by an outside expert. The court also ordered that all pleadings had to be filed by the parties no later than 5:00 p.m. on April 21, 2011.

Although defense counsel were not permitted to have Simon evaluated by an outside expert, they contacted John Goff, Ph.D., a board-certified

5

neuropsychologist, and asked him to provide an opinion on Simon's competence based upon Simon's medical records and the affidavits of his attorneys. Dr. Goff opined that Simon's medical records "quite strongly suggest[] the occurrence of a significant neuropsychological event on 07 January 2011." Dr. Goff further stated:

> The course of events here suggests that the neuropsychological defect demonstrated by Mr. Simon may indeed be interfering substantially with his ability to communicate with his attorneys and that it may well constitute a mental illness or defect that is preventing him from comprehending the reasons for the penalty imposed upon him or its implications. The descriptions of him suggest that he may have little or no understanding of the concepts shared by his attorneys and the community as a whole. I am not even certain that he has a factual understanding of his current situation.

In addition, Dr. Goff noted that the mental status examination conducted upon Simon by Dr. Beaven was "frankly abnormal" and "would seem to require further follow up and more extensive examination." Finally, Dr. Goff stated that "[t]he only way to make definitive judgments in regard to [Simon's] capacities to understand his current situation and to determine the presence or absence of significant mental illness or mental defect is for neuropsychological evaluation to be performed." Defense counsel submitted Dr. Goff's affidavit, along with their own affidavits and his medical records, in support of their petition for post-conviction relief on April 20, 2011.

The State filed its response to Simon's petition on April 21, 2011, attaching affidavits from Dr. Nagel and Dr. Beaven, as well as an affidavit from Dr. William Carter.[2] Dr. Nagel's affidavits asserted that (1) Simon communicated normally in English, (2) he was "sufficiently competent in his mental functions to understand his situation," (3) nothing "suggest[ed Simon] had a lack of

---

[2] Dr. Carter's exact degree is unclear; he states by affidavit that he has "a degree from California University in psychology."

understanding of his situation," (4) Dr. Nagel had "not known of a patient that lost long-term, mid-term, and short-term memory contemporaneously," and (5) Dr. Nagel did not observe any memory loss in Simon during their conversation. Dr. Carter's affidavit described a visit he had with Simon on April 8, 2011, approximately a week after Simon filed his petition for post-conviction relief based on his incompetence and a day after the Mississippi Supreme Court held in abeyance Simon's motion for a court order for his own expert to evaluate him. Dr. Carter stated in his affidavit that his conversation with Simon was "normal" and that Simon was "jovial and conversant."  Because of the deadline imposed by the Mississippi Supreme Court, Simon was unable to reply to the State's responsive materials.

The Mississippi Supreme Court issued an En Banc Order on the basis of the record evidence on May 5, 2011, denying Simon's petition for post-conviction relief after concluding that Simon had "failed to make a substantial threshold showing of insanity/mental illness."  In coming to this conclusion, the court appeared to rely on the following findings of fact: (1) Dr. Goff was only able to state that "Simon *may* have suffered a significant neurological event," rather than stating that conclusion unequivocally; (2) Simon's medical records "reveal[ed] normal neurological findings at all relevant times"; and (3) the affidavits from health care professionals submitted by the State reflected that "Simon was lucid and communicated normally before and after January 7, 2011."

Simon filed a petition for a writ of habeas corpus in the United States District Court for the Northern District of Mississippi on May 13, 2011.  On May 20, 2011, the court denied his petition for the writ.  The district court also relied upon the uncertainty in Dr. Goff's opinion regarding Simon's competence, noting that suggestions of *possible* incompetence have previously been rejected by this court, *see Johnson v. Cabana*, 818 F.2d 333, 339–40 (5th Cir. 1987), as insufficient to make a substantial threshold showing of incompetence.  The court

ultimately concluded that Simon had failed to show that the Mississippi Supreme Court's ruling was contrary to or an unreasonable application of Supreme Court precedent. Nevertheless, the district court did grant Simon a COA on two issues: (1) Simon's claim of incompetence to be executed, and (2) Simon's claim that the Mississippi Supreme Court violated his right to procedural due process.

## II. JURISDICTION AND STANDARD OF REVIEW

Petitions for writs of habeas corpus are governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *See Holland v. Anderson*, 583 F.3d 267, 271 (5th Cir. 2009). Under AEDPA, one detained as a result of a state court proceeding must obtain a certificate of appealability ("COA") from either the district or circuit court in order to appeal the district court's denial of a petition for the writ. 28 U.S.C. § 2253(c); *see also Medellin v. Dretke*, 371 F.3d 270, 274–75 (5th Cir. 2004). The district court granted Simon a COA, and thus we have jurisdiction to hear his appeal.[3]

When reviewing a district court's denial of a petition for a writ of habeas corpus, we review issues of law de novo and findings of fact for clear error. *Wiley v. Epps*, 625 F.3d 199, 204–05 (5th Cir. 2010). We must also focus our analysis through the deferential lens AEDPA imposes for federal review of state court merits determinations. Specifically, we are prohibited from granting a writ of habeas corpus on a claim that was adjudicated on the merits by a state court unless that adjudication either

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

---

[3] Although Simon has previously applied for habeas relief from this court, *Simon v. Epps*, 394 F. App'x 138 (5th Cir. 2010), his current petition is not considered "second or successive" within the meaning of 28 U.S.C. § 2244(b) because his claim of incompetence to be executed, stemming from an injury taking place on January 7, 2011, was not ripe at the time of his prior petition. *See Panetti*, 551 U.S. at 945.

No. 11-70015

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). "We review pure questions of law under the 'contrary to' standard of sub-section (d)(1), mixed questions of law and fact under the 'unreasonable application' standard of sub-section (d)(1), and pure questions of fact under the 'unreasonable determination of facts' standard of sub-section (d)(2)." *Simmons v. Epps*, 654 F.3d 526, 534 (5th Cir. 2011) (quoting *Murphy v. Johnson*, 205 F.3d 809, 813 (5th Cir. 2000)).

## III.  DISCUSSION

Simon challenges his competency to be executed.  The law that governs this type of claim includes the Supreme Court's decisions in *Ford* and *Panetti*. In *Ford*, the Supreme Court held that the Eighth Amendment prohibits the execution of a prisoner who is incompetent.  477 U.S. at 409–10.  Justice Powell's concurrence in the *Ford* plurality opinion, which has been declared the "clearly established" Supreme Court law regarding 28 U.S.C. § 2254, *Panetti*, 551 U.S. at 949, stated that to be competent for execution, a prisoner must "know the fact of [his] impending execution and the reason for it."  *Ford*, 477 U.S. at 422 (Powell, J., concurring).  Mississippi has codified its own test for competence to be executed, which provides that the prisoner must have

> sufficient intelligence to understand the nature of the proceedings against him, what he was tried for, the purpose of his punishment, the impending fate that awaits him, and a sufficient understanding to know any fact that might exist that would make his punishment unjust or unlawful and the intelligence requisite to convey that information to his attorneys or the court.

Miss. Code Ann. § 99-19-57(2)(a), (b).

In *Ford*, Justice Powell outlined the process that states must follow when ruling on the competence of a prisoner to be executed.  First, the state may require that the prisoner make a "substantial threshold showing of insanity."

477 U.S. at 426 (Powell, J., concurring).  After such a showing has been made, the prisoner becomes entitled to a "fair hearing" on the issue of his competence, which must include "an impartial officer or board that can receive evidence and argument from the prisoner's counsel, including expert psychiatric evidence that may differ from the State's own psychiatric examination."  *Id.* at 427.

The Mississippi Supreme Court, in its May 5 order, did not claim to have afforded Simon the "basic requirements" of due process under *Ford*.  Rather, the court found that Simon had "failed to make a substantial threshold showing of insanity/mental illness."  It thus determined that he was not entitled to either a stay of execution or a *Ford* hearing.  In reviewing the state court's order, the district court held that Simon had "not demonstrated that it was unreasonable for [the] Mississippi Supreme Court to determine that he failed to make a 'substantial threshold showing of insanity' that would entitle him to additional process under *Ford* and *Panetti*."  Thus, under AEDPA, the question we are reviewing is whether the Mississippi Supreme Court's determination that Simon failed to make a substantial threshold showing of incompetence was either contrary to or an unreasonable application of clearly established federal law, or based upon an unreasonable determination of the facts in light of the evidence presented.  In addition to obtaining a COA from the district court on his claim that he is incompetent to be executed, Simon also was granted a COA on his claim that the Mississippi Supreme Court violated his right to procedural due process in handling his claim.  We also review this claim under AEDPA's deferential standard.

We turn first to Simon's claim that the process employed by the Mississippi Supreme Court in making its determination of competency violated his right to procedural due process.  In *Panetti*, the petitioner claimed that the state court proceedings on the issue of his competency to be executed were insufficient to satisfy the procedural requirements mandated by *Ford*.  551 U.S.

at 935. In reviewing this claim, the Supreme Court applied the "unreasonable application" standard of 28 U.S.C. § 2254(d)(1). *Id.* at 948. As Simon's claim also challenges the adequacy of the procedures he was afforded, we will apply the same standard of review here.

A state court decision involves an "unreasonable application" of Supreme Court precedent when the state court either (1) "identifies the correct governing legal rule from the Court's cases but unreasonably applies it to the facts of the particular state prisoner's case," (2) "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply," or (3) "unreasonably refuses to extend that principle to a new context where it should apply." *Williams v. Taylor*, 529 U.S. 362, 407 (2000). The burden of proving that a state court unreasonably applied federal law is weighty: "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 131 S. Ct. 770, 786–87 (2011).

In order to determine whether the Mississippi Supreme Court violated Simon's right to procedural due process in the course of his post-conviction relief proceedings, we must first determine what process Simon was due. In addition to general due process principles,[4] the Court in *Ford* discussed what due process requires in the specific context of the competency evaluation. In concluding that the state prisoner in *Ford* had been denied due process, Justice Powell explained

---

[4] Generally, due process requires that the person whose rights may be affected have a "meaningful opportunity to present [his] case." *Mathews v. Eldridge*, 424 U.S. 319, 349 (1976). In addition, "the hallmark of the procedural protections afforded by the Due Process Clause" is "fundamental fairness." *Ford*, 477 U.S. at 424 (Powell, J., concurring) (citing *Lassiter v. Dep't of Soc. Servs.*, 452 U.S. 18, 24–25 (1981)). Finally, the process that someone receives will violate the Due Process Clause where "the factfinding procedures upon which the court relied were 'not adequate for reaching reasonably correct results' or, at a minimum, resulted in a process that appeared to be 'seriously inadequate for the ascertainment of the truth.'" *Panetti*, 551 U.S. at 954 (quoting *Ford*, 477 U.S. at 423–24 (Powell, J., concurring)).

the shortcomings of the procedure that had been used by the state court to evaluate the prisoner's competence to be executed:

> [T]he determination of petitioner's sanity appears to have been made *solely* on the basis of examinations performed by state-appointed psychiatrists. Such a procedure invites arbitrariness and error by preventing the affected parties from offering contrary medical evidence or even from explaining the inadequacies of the State's examinations. It does not, therefore, comport with due process.

477 U.S. at 424 (Powell, J., concurring). This section of Justice Powell's concurrence provided the fifth vote for the holding that Ford had been denied due process.[5] It is therefore clearly-established federal law that a process for making the ultimate determination of competency to be executed that allows the state to submit the results of psychiatric examinations of the prisoner while preventing the prisoner from responding with his own medical evidence or argument violates due process. Although Simon's claim never reached the second stage of the bifurcated competency evaluation, Simon argues that the process he received at the initial stage of this evaluation was so unfair and one-sided that it amounted to an unreasonable application of the law clearly established by *Ford* and *Panetti*. We agree.

Although Simon was not allowed to be evaluated by an expert, the State had him evaluated by its own experts and submitted this evidence to the Mississippi Supreme Court to prove his competence to be executed. On April 4, 2011, Simon moved the Mississippi Supreme Court for an order allowing a mental health expert to have access to Simon in order to evaluate him. The motion was held in abeyance, which effectively prevented Simon from being

---

[5] The plurality in *Ford* similarly concluded that "the denial of any opportunity to challenge or impeach the state-appointed psychiatrists' opinions" was a procedural flaw that contributed to the violation of the prisoner's due process rights. *Ford*, 477 U.S. at 415 (plurality opinion).

evaluated by a mental health expert, as MDOC permits doctors and other medical professionals to evaluate death row prisoners only if they have obtained a court order to do so. The best evidence that Simon was able to amass, given the restrictions imposed upon him, was an affidavit from Dr. Goff, which was given based upon Simon's medical records and the affidavits of Simon's counsel.

The State of Mississippi was not subject to the same restrictions. On March 21, 2011, the day that the Supreme Court denied Simon's petition for a writ of certiorari and the State filed a motion to reset Simon's execution date, the prison superintendent sent Dr. Beaven to evaluate Simon's "memory and confusion." Dr. Beaven gave an affidavit about this visit and his notes were included in Simon's medical records, both of which were considered by the Mississippi Supreme Court and cited in its order denying post-conviction relief. The State also submitted two affidavits given by Dr. Nagel, a psychiatrist employed by MDOC, based on a visit with Simon that seems to have taken place some time in March 2011. Dr. Nagel's affidavits contained several assertions that Simon was competent to be executed. On April 8, 2011, the day after Simon's motion to have his own expert evaluate him was held in abeyance, Simon was visited in his cell by Dr. Cartier, a psychologist working at MDOC. Dr. Cartier also gave an affidavit that was submitted by the State to the Mississippi Supreme Court. The Mississippi Supreme Court relied upon these "affidavits from health care professionals, who found that Simon was lucid and communicated normally before and after January 7, 2011," in denying Simon's motion for post-conviction relief.

Even though *Ford* does not grant prisoners a psychiatric evaluation by an expert of their choosing as a matter of right until after a threshold showing of incompetence has been made, the inequitable access to experts in this case still runs afoul of the right to due process as discussed in *Ford*. Justice Powell was clear that a procedure that prevents the prisoner from offering expert evidence

while empowering the state to offer such evidence "invites arbitrariness and error." *Ford*, 477 U.S. at 424 (Powell, J., concurring). The *Ford* plurality also expressed its concern that considering expert evidence from only one party could severely undermine the truth-seeking function of the competency evaluation:

> [B]ecause psychiatrists disagree widely and frequently on what constitutes mental illness and on the appropriate diagnosis to be attached to given behavior and symptoms, the factfinder must resolve differences in opinion within the psychiatric profession on the basis of evidence offered by each party when a defendant's sanity is at issue . . .

*Id.* at 414 (plurality opinion) (quoting *Ake v. Oklahoma*, 470 U.S. 68, 81 (1985) (internal quotation marks omitted).

In denying Simon's petition for a writ of habeas corpus, the district court stated: "[Simon] argues that the standards in *Panetti* and *Ford* entitle him to a defense expert in order to make a substantial threshold showing of insanity. They do not." The district court was correct in its assessment of *Panetti* and *Ford*, and we do not hold today that prisoners are entitled to experts in order to make a threshold showing of incompetence. We merely hold that the procedures in this case, which allowed the State to present expert evaluations while Simon was prevented from presenting countervailing expert evaluations, violated fundamental fairness and due process.

The impact of the court's order denying Simon an expert evaluation was magnified when the court suggested that the uncertainty of Dr. Goff's affidavit undermined his opinion. The court stated, "Goff opined that Simon *may* have suffered a significant neurological event on January 7, 2011, and the only way to determine the presence or absence of mental illness was for an evaluation to be performed."[6]    It is difficult to view the process Simon received as

---

[6] Both the Mississippi Supreme Court and the district court relied on *Johnson v. Cabana*, 818 F.2d 333 (5th Cir. 1987), in which this court held that a psychologist's conclusion that a prisoner's mental condition "'*may*' impair his relations with his counsel" was insufficient

fundamentally fair when the court discounted the one affidavit that Simon was able to obtain for its uncertainty, when that uncertainty was a direct result of the court's refusal to grant an order allowing Dr. Goff to evaluate Simon. Under the circumstances the court created, it is hard to imagine what more Simon could have done to make a threshold showing of incompetence.

Not only was Simon prevented from countering the State's medical evaluations with his own, he was also prevented from even addressing them with argument. The court set a deadline of April 21, 2011 at 5:00 p.m. for all submissions related to Simon's petition for post-conviction relief. Simon submitted a supplement to his petition on April 20, attaching Dr. Goff's affidavit. The State submitted its response, along with the affidavits of Drs. Beaven, Nagel, and Cartier, on April 21, the deadline. Because the court refused to accept submissions past this deadline, Simon did not have the opportunity to respond to the affidavits submitted by the State. Justice Powell's *Ford* concurrence states that a procedure that prevents a prisoner from "explaining the inadequacies of the State's examinations" does not comport with due process. *Ford*, 477 U.S. at 424 (Powell, J., concurring). The *Ford* plurality explained that the opportunity to respond is important because it allows the prisoner to

> bring[] to light the bases for each expert's beliefs, the precise factors underlying those beliefs, any history of error or caprice of the examiner, any personal bias with respect to the issue of capital punishment, the expert's degree of certainty about his or her own conclusions, and the precise meaning of ambiguous words used in the report. Without some questioning of the experts concerning their technical conclusions, a factfinder simply cannot be expected

---

to constitute a substantial threshold showing of incompetence, *id.* at 340. Each court suggested that Dr. Goff's uncertain opinion here is unavailing for the same reason. In coming to this conclusion, each court overlooked the critical distinguishing fact that in *Cabana*, the psychologist examined the prisoner for five hours before giving his equivocal diagnosis of incompetence, *id.* at 337, whereas here Dr. Goff was never permitted to examine Simon. *Cabana* is therefore not controlling.

to evaluate the various opinions, particularly when they are themselves inconsistent.

*Id.* at 415 (plurality opinion).   Even before *Ford*, the Supreme Court had characterized as "relatively immutable" the principle that

> "where governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue. While this is important in the case of documentary evidence, it is even more important where the evidence consists of the testimony of individuals whose memory might be faulty or who, in fact, might be perjurers or persons motivated by malice, vindictiveness, intolerance, prejudice, or jealousy."

*Goldberg v. Kelly*, 397 U.S. 254, 270 (1970) (quoting *Greene v. McElroy*, 360 U.S. 474, 496 (1959)).

When viewed as a whole, the process employed by the Mississippi Supreme Court was marred by very similar flaws to those that caused a majority of the Court in *Ford* to hold that the prisoner's due process rights had been violated. It matters not that here these flaws appeared in the threshold stage of the competency evaluation rather than the hearing stage.   The competency evaluation must at all times be a process that is fundamentally fair to the prisoner alleging his own incompetence, and the process Simon received did not meet that standard.

We hold that under the facts and circumstances of this case, set out in this opinion, the Mississippi Supreme Court unreasonably applied clearly established federal law by failing to apply fundamental due process principles to the first stage of Simon's competency evaluation.   The process that Simon received deprived him of a meaningful opportunity to make a substantial threshold showing of incompetence and thus violated his due process rights.  We therefore reverse the district court's denial of Simon's petition for a writ of habeas corpus and we remand this case to the district court for additional proceedings

consistent with this opinion.  Thus, we need not reach Simon's claim that he met the threshold showing of incompetence.

REVERSED AND REMANDED.